IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| TIMOTHY COOLEEN, | ) | |
| | ) | Civil Action No. 04-63E |
| Plaintiff, | ) | |
| | ) | Hon. Sean McLaughlin |
| v. | ) | U.S. District Judge |
| | ) | |
| JOHN LAMANNA, et al., | ) | Hon. Susan Paradise Baxter |
| | ) | U.S. Magistrate Judge |
| Defendants. | ) | |
| | ) | ELECTRONICALLY FILED |

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF
THEIR MOTION TO DISMISS PLAINTIFF'S SECOND
AMENDED COMPLAINT OR, IN THE ALTERNATIVE,
FOR SUMMARY JUDGMENT**

## I.  PRELIMINARY STATEMENT

Defendants, by and through their attorneys, Mary Beth Buchanan, United States Attorney

for the Western District of Pennsylvania, and Paul D. Kovac, Assistant United States Attorney

for said district, submit this Memorandum of Law in Support of Their Motion, pursuant to Fed.

R. Civ. P. 12(b)(6), to dismiss the remaining Eighth Amendment allegation in Plaintiff's Second

Amended Complaint.  Alternatively, Defendants move for summary judgment.

This case is before the Court a second time after remand from the United States Court of

Appeals for the Third Circuit ("the Third Circuit").  Plaintiff, appearing in this case pro se,

originally sued ten defendants upon three grounds.  First, in accordance with Bivens v. Six

Unknown Named Agents of the Federal Bureau of Narcotics, 403 U.S. 388 (1971), Plaintiff

claimed that Defendants were deliberately indifferent to his serious medical needs, and as a

result, subjected him to cruel and unusual punishment in violation of the Eighth Amendment.

Second, Plaintiff claimed that Defendants violated his Fifth Amendment right to due process.

Finally, Plaintiff claimed that the United States of America was negligent in violation of the

Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671 et seq, for failing to timely diagnose and

treat the back injury he allegedly sustained while working at FCI McKean.

On August 1, 2005, the Magistrate Judge issued a Report and Recommendation

("the R & R") recommending that the entire Second Amended Complaint be dismissed.  The

Court adopted the R & R and dismissed the case on August 30, 2005.  Plaintiff appealed to the

Third Circuit.

On September 14, 2007, the Third Circuit affirmed the Court's dismissal of the due

process and FTCA claims.  However, the Third Circuit remanded the case with regard to

Plaintiff's Eighth Amendment claim.  Specifically, the Third Circuit concluded that "the District

Court's analysis did not address the issue of prison officials' delay or denial of recommended

treatments . . . [and] whether these instances amount to a constitutional violation."  Cooleen v.

Lamanna, et al., 248 Fed. Appx. 357, 361 (3d Cir., Sept. 14, 2008).

The parties have completed discovery on the Eighth Amendment issues.  Because none of

the remaining Defendants were deliberately indifferent to Plaintiff's medical needs, this case

should be dismissed.

## II.  **FACTUAL BACKGROUND**

### A.    **Plaintiff's Incarceration & Previous Back Injury**

Pursuant to his plea, Plaintiff was convicted of possession with intent to distribute

cocaine.  Attachment ("Att.") A (Excerpts from Plaintiff's Deposition dtd. 1/16/08) at 13-14.  He

was sentenced to 60 months confinement followed by three years of supervised release.  Id. at 15.

2

On April 16, 2001, Plaintiff self-surrendered to the Bureau of Prisons ("BOP") at the Federal

Correctional Institution - McKean ("FCI McKean") in order to begin serving his sentence.  Id.

      Once in custody, the BOP conducted an initial medical exam of Plaintiff.  Att. B (Medical

Records) at 2-7.  During this exam, Plaintiff indicated that he had a diskectomy in March 1999.

Id. at 2-4.  The surgery resulted from a 1993 car accident where Plaintiff was the victim of a hit-

and-run.  Att. A at 24.  The injury was to Plaintiff's right side.  Id. at 26, 29.  He indicates that the

surgery relieved his back pain, but he continues to have permanent damage to nerves in his right

leg and decreased mobility and strength.  Id. at 29-30.  Despite this injury, Plaintiff was

functioning well enough to be medically cleared, and he was assigned a prison job at FCI

McKean.  Id. at 31; Att. B at 4.

      **B.**    <u>**The Back Injury of March 21, 2002**</u>

      On March 21, 2002, Plaintiff claims that he "pulled his back" while "moving some

furniture in Human Resources."  Att. B at 9.  Specifically, Plaintiff testified that he was painting

the human resources offices and injured his back after moving a shelf with another inmate.  Att.

A at 37-38.  He states that the pain immediately radiated down his left leg.  Id. at 38-39.  This

injury occurred on a Thursday, and, after a weekend of discomfort, Plaintiff reported to sick call

on Monday, March 25, 2002, and was told to remain "[i]dle" and return the next day for an

appointment.  Att. B at 9, 10.

      **C.**    <u>**The Care & Treatment of Plaintiff's Back Injury:  March 2002 - March 2003**</u>

      The details of Plaintiff's care and treatment by BOP medical providers during this time

period are thoroughly explained in the declaration of Dr. Herbert Beam.  Att. C (Dr. Beam Decl.

dtd. 5-21-08).  In this declaration, Dr. Beam describes over 25 visits and consultations Plaintiff

received during the course of his treatment at FCI McKean.  Id. at ¶¶ 13-60.  A few of the highlights are explained here.

Plaintiff's back injury was treated pursuant to a conservative course of treatment (i.e., limit mobility, proper exercise, anti-inflammatory medication, and hot/cold compresses).  Id. at ¶¶ 5, 17.  In his 26 years of experience with injuries of this type, Dr. Beam explains that the majority of patients with injuries similar to Plaintiff's, experience relief without surgical intervention.  Id. at ¶¶ 4, 5.  Although the healing process is often painful and the subject of many complaints, it is acceptable to treat most disk injuries conservatively due to the risks and unsure outcomes of surgery.  Id. at ¶¶ 4-9.  Dr. Beam indicates that approximately 90% of patients with low back pain or a herniated lumbar disk improve without surgery.  Id. at ¶ 7.

In Plaintiff's case, treatment was immediately provided upon his visit to sick call on March 26, 2002.  Plaintiff was prescribed Motrin, instructed to apply ice packs, and given several days off his work assignment.  Att. C at ¶¶ 13-14.  Plaintiff was seen repeatedly over the next two months and properly treated in accordance with conservative treatment techniques.  Id. at ¶¶ 15-19.

After continual complaints and indications that the pain was not subsiding, Dr. Beam provided Plaintiff with a referral to an orthopedic consult on July 3, 2002.  Id. at ¶ 20.  Plaintiff was examined by an orthopedist, Dr. Soares, on July 10, 2002, and a steriod injection was provided to alleviate his pain.  Id. at ¶ at 21.  Dr. Soares also recommended an MRI of Plaintiff's spine.  Id.  On July 11, 2002, Dr. Beam reviewed this recommendation and forwarded it to the Utilization Review Committee ("URC") for consideration.  Id.  MRIs and other diagnostic procedures require travel outside the prison facility and must first be reviewed and approved by

4

the URC (a committee of medical and security personnel) at FCI McKean.  Id. at ¶ 33.  Unless the procedure is life-threatening or absolutely urgent, the approval process takes time and, in addition to the patient's medical condition, consideration is given to the security requirements necessary to transport prisoners as well as the appointment schedules of civilian physicians.  Id.

On July 24, 2002, Plaintiff was seen for a second time by Dr. Soares.  During this visit, Plaintiff received another steroid injection to help manage his pain.  Id. at ¶ 27.  Dr. Soares reiterated his recommendation for an MRI and referred Plaintiff to a pain management clinic.  Id. at ¶¶ 27-28.

The URC unanimously approved the recommendation for an MRI on August 2, 2002.  Att. C at ¶ 29.  Plaintiff was examined again, on August 16, 2002, and received his MRI on August 21, 2002.  Id. at ¶¶ 30-32.  The MRI revealed an acute herniated disk at L4-L5.  Id.  A conservative course of treatment is perfectly acceptable to address this type of back problem.  Id. at ¶ 7.

On September 4, 2002, Plaintiff received yet another exam by Dr. Soares.  Id. at ¶ 37.  At that time, Dr. Soares recommended that Plaintiff be considered for a "possible" laminectomy.  Id.  Plaintiff was examined and treated at least two more times during September 2002.  Id. at ¶¶ 38-41.

In October 2002, the BOP's Medical Designations Section, after considering the recommendation for potential back surgery, denied the request to transfer Plaintiff to a medical center for surgery because his condition had stabilized.  Att. C at ¶ 42.  Dr. Beam's conservative course of treatment was progressing favorably.  Id.  Indeed, in November 2002, Dr. Beam saw Plaintiff on the track at FCI McKean, walking briskly with a fluid gait.  Id. at ¶ 44.  Plaintiff told

5

Dr. Beam that he felt "no better, no worse." Id. Dr. Beam was also aware that laminectomy

surgery is not the optimal course of treatment because it may diminish the stability of the spine in

certain cases. Id. at ¶ 38. Additionally, Plaintiff did not exhibit the traditional indicators for this

type of surgery, that is, "a massive herniation of a disk that is impinging upon a nerve to the

bladder or anal sphincter or significant extremity muscle weakness." Id.

However, Plaintiff continued to advocate for surgery. Att. C at ¶¶ 45, 46. Recognizing

that surgery was not a "cure all" and that it was a "judiciously" administered treatment option,

Dr. Beam decided to continue with the conservative course of treatment. Id. at ¶¶ 42, 45, 47.

Once again, his examination and medical judgment did not support surgical intervention, and the

conservative course of treatment was progressing favorably. Id. Dr. Beam continued to treat and

address Plaintiff's pain concerns in January and February 2003. Id. at ¶¶ 48-50.

### D.     The Canceled Surgery and Healing of Plaintiff's Back

Due to Plaintiff's continued persistence for surgery, Dr. Beam referred the case to the

URC in February 2003, and a neurosurgeon consult was approved. Att. C at ¶¶ 49-50. On

March 27, 2003, Dr. Steven A. Gilman, a neurosurgeon, examined Plaintiff and diagnosed a

herniated disk based, in part, on Plaintiff's MRI taken in August 2002. Id. at ¶ 51. Dr. Gilman

recommended another MRI to confirm the diagnosis, and surgical intervention was "offered" as

potential treatment. Id. On April 2, 2003, Dr. Beam examined Plaintiff and advised him of the

planned course of treatment. Id. at ¶ 52.

Plaintiff was admitted to the hospital for another MRI and potential surgery on May 13,

2003. Att. C at ¶ 53. A physical examination revealed that Mr. Cooleen's gait and station were

"within normal limits" and that he had good strength in all of his amenities with positive straight

leg raising on the left side. <u>Id.</u> The results of the second MRI, however, revealed that the herniated disk had resolved itself. <u>Id.</u> at ¶ 54. Under these circumstances, the neurosurgeon concluded that Plaintiff did not require surgery. <u>Id.</u> at ¶ 55.

On or about June 18, 2003, the URC declined to send Plaintiff outside FCI McKean to Erie, Pennsylvania, for a follow-up appointment with the neurosurgeon, Dr. Gilman. Att. C at ¶ 56. At this point, it was established that Plaintiff did not require surgery, and his back injury could be easily monitored by Dr. Soares, the orthopedist who visited FCI McKean on a regular basis. <u>Id.</u> Indeed, Dr. Soares did see Plaintiff on August 20, 2003. <u>Id.</u> at ¶ 60. This exam was unremarkable, and continuation of the conservative course of treatment was recommended. <u>Id.</u>

Plaintiff was subsequently transferred to FCI Schuylkill on or about September 15, 2003. Att. C at ¶ 61. Another MRI, taken on March 17, 2004, revealed no evidence of any recurrent disk herniation. <u>Id.</u> at ¶ 62.

### E.    <u>Independent Review Concludes That Plaintiff's Treatment Was Proper.</u>

During discovery, Defendants obtained the expert opinion of Dr. William Welch. Att. D (Expert Report and CV). Dr. Welch is a board-certified neurosurgeon and Chief of the Department of Neurosurgery at Pennsylvania Hospital. <u>Id.</u> at Dr. Welch Ltr. dtd. 4-15-08; CV. He is also a tenured professor of neurological surgery at the University of Pennsylvania School of Medicine. <u>Id.</u> at CV p. 2.

Defendants asked Dr. Welch to review the medical records in this case and offer an opinion concerning whether the conservative course of treatment was proper. Att. D at Kovac Ltr. dtd. 2-6-08. After a thorough review of the record, including the examination of MRI film, Dr. Welch concluded that "Mr. Cooleen received more than appropriate and acceptable medical

care.  His treatment exceeded the reasonable standard of care for the evaluation and treatment of sciatica." <u>Id.</u> at Dr. Welch's Ltr. dtd. 4-15-08.  Dr. Welch confirmed the BOP's position that surgery, no matter what stage in the treatment process, is not a guarantee.  <u>Id.</u>  Dr. Welch also confirmed that "most patients with sciatica due to a disc rupture do not require surgery and are treated with modalities such as bed rest and anti-inflammatories" - the exact treatment that was provided to Plaintiff.  <u>Id.</u>

### III.  <u>ARGUMENT</u>

#### A.   <u>Standard of Review</u>

As stated above, all the claims in the Second Amended Complaint have been dismissed except the deliberate indifference claims raised pursuant to the Eighth Amendment.  For these remaining claims, Defendants are moving for dismissal pursuant to Fed. R. Civ. P. 12(b)(6), or alternatively, for summary judgment.

A motion to dismiss under Rule 12(b)(6) is the appropriate method to challenge the legal sufficiency of claims in a complaint.  Fed. R. Civ. P. 12(b)(6); <u>Raines v. Haverford College</u>, 849 F. Supp. 1009, 1010 (E.D. Pa. 1994).  Although courts reviewing Rule 12(b)(6) motions generally consider only the allegations in the complaint, courts are also free to examine any exhibits attached thereto, other undisputed documents relied on by the Plaintiff, other items appearing in the record of the case, and matters of public record.  <u>Raines,</u> 849 F. Supp. at 1010; <u>see</u> <u>also</u> <u>Oshiver v. Levin, Fishbein, Sedran & Berman</u>, 38 F.3d 1380, 1384 n.2 (3d Cir. 1994); <u>Pension Ben. Guar. Corp. v. White Consol. Indus., Inc.</u>, 998 F.2d 1192, 1196 (3d Cir. 1993). Indeed, if a court could not consider such documents, "'a Plaintiff with a legally deficient claim could survive a motion to dismiss simply by failing to attach a dispositive document upon which

[he] relied.'" Interfaith Community Org. v. AlliedSignal, Inc., 928 F. Supp. 1339, 1345 (D.N.J. 1996) (quoting Dykes v. Southeastern Pa. Trans. Auth., 68 F.3d 1564, 1567 n.3 (3d Cir. 1995)).

While courts considering motions to dismiss have a limited role, courts should grant such motions where it is clear that no relief could be granted under any set of facts that are consistent with the allegations of a complaint. Interfaith Community Org., 928 F. Supp. at 1346. The issue is not whether the Plaintiff will ultimately prevail but whether the Plaintiff has any chance of doing so. Id.; Hishon v. King & Spalding, 467 U.S. 69, 73 (1984). When making this determination, courts "must accept as true all of the matters pleaded and all reasonable inferences that can be drawn therefrom, construing them in the light most favorable to the non-moving party." Raines, 849 F. Supp. at 1010. Nevertheless, legal conclusions made in the guise of factual allegations should not be given any presumption of truthfulness. Interfaith Community Org., 928 F. Supp. at 1346.

Where, as here, defendants have also presented matters outside the pleadings, the Court may consider them and, in so doing, may treat defendants' motion as one for summary judgment to be disposed in accordance with Fed. R. Civ. P. 56. See Fed. R. Civ. P. 12(b). Rule 56 mandates the entry of summary judgment against the party who fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). In considering a motion for summary judgment, this Court must examine the facts in a light most favorable to the party opposing the motion. International Raw Materials, Ltd. v. Stauffer Chem. Co., 898 F.2d 946, 949 (3d Cir. 1990). The burden is on the moving party to demonstrate that

the evidence creates no genuine issue of material fact. <u>Chipollini v. Spencer Gifts, Inc.</u>, 814 F.2d 893, 896 (3d Cir. 1987).

    **B.    Plaintiff's Claims Against Defendants Lamanna, Menna, Grim, and Smith Must Be Dismissed Because *Respondeat Superior* Cannot Form <u>the Basis of a Bivens Claim.</u>**[1]

    To survive a motion to dismiss, a <u>Bivens</u> action must allege specific acts committed by the defendants in violation of constitutional rights. <u>Wright v. Smith</u>, 21 F.3d 496 (2d Cir. 1994); <u>Cameron v. Thornburgh</u>, 983 F.2d 253 (D.C. 1993). There must be acquiescence or participation in the alleged constitutional violation before liability may attach. <u>Farmer v. Carlson</u>, 685 F. Supp. 1335, 1338 (M.D. Pa. 1988).

    Among the Defendants named by Plaintiff are: John Lamanna (Warden); Mr. Menna (Hospital Administrator); Gary Grim (Associate Warden); and R. Smith (Hospital Administrator). These individuals were all supervisory and administrative personnel, and there is nothing in the record to suggest that they had any extensive personal involvement in the physical medical care rendered to Plaintiff. Indeed, none of the medical records indicate that treatment was directly provided by these individuals. <u>See</u> Att. B (medical records). Decisions regarding Plaintiff's treatment and care, including those concerning the medical necessity of an MRI or surgery, were made by his medical care providers, Dr. Olson, Dr. Beam, and to a limited extent,

---

    [1] Three of these Defendants (Grim, Menna, and Smith) were previously dismissed by the Court pursuant to a *respondeat superior* analysis. <u>See</u> Docket No. 70 at pp. 10-11 (R & R dtd. 8/1/2005). Because the Third Circuit's decision does not directly address the *respondeat superior* issue, we have again presented the issue to the Court for dismissal.

Physician Assistant/Assistant Health Care Administrator Todd Montgomery.  See Att. B

(medical records containing the names of treating physicians and physician assistant).[2]

Lamanna, Grim, Menna, and Smith cannot be held personally liable under the doctrine of

respondeat superior.  Where, as here, prison officials rely on medical experts to take action on a

prisoner's medical complaint, they cannot be found to have committed a constitutional tort.  See

Durmer v. O'Carroll, 991 F.2d 64 (3rd Cir. 1993) (prison officials who are not physicians cannot

be considered deliberately indifferent to a prisoner's serious medical needs because they failed to

respond directly to medical complaints of prisoners who were being treated by the prison doctor).

See also Curry v. Scott, 249 F.3d 493 (6th Cir. 2001); Alexander v. Federal Bureau of Prisons,

227 F.Supp.2d 657 (E.D. Ky. 2002).  Accordingly, Plaintiff's Bivens claims against Defendants

Lamanna, Menna, Grim, and Smith should be dismissed.

### C.    The Remaining BOP Medical Personnel Were Not Deliberately Indifferent to Plaintiff's Medical Needs.

#### 1.    Preliminary Statement

The BOP medical personnel attending to Plaintiff and making decisions regarding his

medical care were not deliberately indifferent to his medical needs.  Medical records indicate that

---

[2]  Defendant R. Smith's name appears only one time in the submitted medical record where it indicates his participation as one of many committee members in a unanimous decision by the URC, on or about June 18, 2003, denying a re-check visit with Dr. Gilman after surgery was cancelled in May 2003.  Att. B at 58, 76, 78.  As Dr. Beam explained, the "re-check" visit was denied because it was not medically necessary due to the resolution of the herniation and the fact that Plaintiff would be monitored by the orthopedist at FCI McKean (Dr. Soares) instead of transporting Plaintiff all the way to Erie to visit with Dr. Gilman.  Att. C at ¶ 56.  Moreover, because the decision was unanimous, the sole decision of R. Smith was inconsequential.  Accordingly, due to Defendant Smith's minor involvement that is limited to one inconsequential decision, Defendants contend that Mr. Smith should be dismissed because he has failed to play an "affirmative part" in the complained-of misconduct.  Chinchello v. Fenton, 805 F.2d 126, 133 (3d Cir. 1986).

Plaintiff's injury was a rather typical disk herniation. Exs. B & C. According to the opinions of at least four physicians, the injury was properly treated with a conservative course of treatment that did not require surgery. See, e.g., Att. B at 75 (Dr. Gilman concluded that Mr. Cooleen's herniated disk had healed on its own, and, as a result, there was no need for surgery); 81 (Dr. Soares, the orthopedist, examined Mr. Cooleen for a follow-up appointment in August 2003 and recommended that he continue with conservative treatment); Att. C at ¶ 42 (Dr. Beam stating in October 2002 that "Mr. Cooleen's condition had stabilized, and my physical examination indicated that the conservative treatment of his low back pain was progressing favorably."); Att. D (Dr. Welch concluded that "Mr. Cooleen received more than appropriate and acceptable medical care. His treatment exceeded the reasonable standard of care for the evaluation and treatment of sciatica.").

During the course of his treatment (from approximately March 2002 through August 2003), Plaintiff was seen on over 25 occasions by various physicians and consultants. Att. B. Although Plaintiff may have experienced pain and discomfort and disagreed with the course of treatment, there is nothing to suggest any degree of indifference necessary to constitute a constitutional violation. Accordingly, all remaining counts alleging deliberate indifference to Plaintiff's medical needs should be dismissed.

## 2.    Deliberate Indifference - Legal Principles

Plaintiff's claim for denial of adequate medical care is governed by the Eighth Amendment, which guarantees individuals the right to be free from cruel and unusual punishment. Estelle v. Gamble, 429 U.S. 97 (1976); Inmates of Allegheny County Jail v. Pierce, 612 F.2d 254 (3d Cir. 1979). While the United States Constitution does not require "comfortable

prisons," it does not "permit inhumane ones." <u>Farmer v. Brennan</u>, 511 U.S. 825, 832 (1994). The Supreme Court has specifically recognized that the Eighth Amendment right is violated when a prison official exhibits deliberate indifference to the serious needs of an inmate. <u>Wilson v. Seiter</u>, 501 U.S. 294, 301 (1991); <u>Estelle</u>, 429 U.S. at 104-05.

In order to state a claim of deliberate indifference under the Eighth Amendment, Plaintiff must satisfy two requirements. First, Plaintiff must meet an objective showing that he has a serious medical need. <u>Monmouth County Corr. Inst'l Inmates v. Lanzaro</u>, 834 F.2d 326, 346-47 (3d Cir. 1987). A medical need is considered "serious" if "it is one that has been diagnosed by a physician as requiring treatment or is so obvious that a lay person would easily recognize the necessity for a doctor's attention." <u>Id.</u>; <u>see</u> <u>also</u> <u>Hudson v. McMillian</u>, 503 U.S. 1, 9 (1992) ("Because society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious.'").

In order to satisfy the second element of an Eighth Amendment claim, a prisoner must prove a subjective element that a particular defendant was "deliberately indifferent" to his serious need. <u>Durmer</u>, 991 F.2d at 67 (quoting <u>Estelle</u>, 429 U.S. at 106). As the Supreme Court has stated, "only such indifference . . . can offend evolving standards of decency in violation of the Eighth Amendment." <u>Estelle</u>, 429 U.S. at 106. The Supreme Court has further clarified that the level of culpability necessary to establish deliberate indifference falls between mere negligence and actual malice (the intent to cause harm). <u>Farmer</u>, 511 U.S. at 836-37. In other words, "deliberate indifference" exists where a prison official knows of a serious danger to an inmate

13

but despite this knowledge, consciously decides to disregard this risk. Id.; Beers-Capitol v.

Whetzel, 256 F.3d 120, 130 (3d Cir. 2001).

>   **3.    Plaintiff Cannot Satisfy the "Deliberate Indifference" Standard Based Upon a Medical Record That Demonstrates Extraordinary Care and Treatment.**

In this case, there is no dispute that Plaintiff's back injury required medical attention and

constitutes a "serious" medical need under the law of this circuit. See Monmouth County, 834

F.2d at 347 (defining a "serious" injury as "one that has been diagnosed by a physician as

requiring treatment or one that is so obvious that a lay person would easily recognize the

necessity for a doctor's attention.") (quoting Pace v. Fauver, 479 F. Supp. 456, 458 (D. N. J.

1979).

The real focus centers upon the subjective prong of the deliberate indifference test and

whether Defendants exhibited a reckless disregard in the treatment of Plaintiff's back injury. See

Farmer, 511 U.S. at 835 (deliberate indifference includes a state of mind equivalent to reckless

disregard of a known risk of harm). The medical record contains no evidence of reckless

disregard by any of the Defendants in this case. In fact, the medical record overwhelmingly

supports the fact that Plaintiff received nothing less than extraordinary care and treatment.

Defendants were immediately attentive to Plaintiff's back injury when it was first reported

on or about March 26, 2002. Att. B at 9. On this date, Plaintiff was thoroughly examined, given

medication, advised to apply hot/cold compresses, and excused from his prison job for several

days. Id. at 9-14. This conservative course of treatment was perfectly acceptable to treat a back

injury such as Plaintiff's. Att. C at ¶ 7; Att. D at Dr. Welch ltr. dtd. 4-15-08 at p. 2. Defendants

continued to treat Plaintiff on a frequent basis, as the medical record documents over 25 visits

and/or consultations with medical personnel after Plaintiff was injured.  Att. B at ¶¶ 13-60; see

Christy v. Robinson, 216 F. Supp.2d 398, 413, 414 (D. N.J. 2002) ("Furthermore, a court will

generally not find deliberate indifference when some level of medical care has been offered to the

inmate . . . In fact, courts may look to the quantity of services and types of treatment offered to

the inmate in its evaluation.").  Plaintiff's treatment included prescription medications to reduce

inflammation, steroid injections, bed rest, relief from his prison work assignment, and frequent

examinations to track the progress of Plaintiff's recovery.  Att. B at ¶¶ 13-60.

        Plaintiff was also provided, on numerous occasions, with orthopedic consultations.  See

Att. B at 22, 26, 34, 81 (consultations with Dr. Soares).  When an MRI was recommended,

Defendants followed through and authorized the MRI to confirm the diagnosis of a disk

herniation.  Att. C at ¶¶ 21, 29, 32-33.  After Plaintiff's continual complaints for surgery,

Defendants went a step further and approved a consultation with a neurosurgeon outside the

prison facility in Erie, Pennsylvania.  Id. at ¶¶ 45, 49-51.  The neurosurgeon, Dr. Gilman,

confirmed the BOP's treatment approach when he declined to perform surgery upon Plaintiff

because a pre-operative MRI revealed complete resolution of the herniated disk.  Att. B at 75.

Simply stated, the medical record belies any claim that Defendants knew of and intentionally

disregarded any risk to Plaintiff's health.  His treatment was continuous, comprehensive, and

ultimately effective.  See Att. C (Dr. Beam details each treatment Plaintiff received from March

2002 through September 2003).  This entire situation is best summarized in the words of

Defendants' expert, Dr. William Welch:

> In my professional medical experience, I would state that most
> patients with Mr. Cooleen's medical complaints receive less
> medical attention and intervention than Mr. Cooleen received
> while incarcerated . . . Mr. Cooleen received more than appropriate
> and acceptable medical care. His treatment exceeded the reasonable
> standard of care for the evaluation and treatment of sciatica.

Att. D. Based upon this medical record, Plaintiff cannot establish the reckless disregard element

that is necessary to prove his deliberate indifference claim.[3]

The gravamen of Plaintiff's case is a disagreement with Defendants regarding their

medical judgment and prescribed treatment. Because he had surgery for his previous back

condition in March 1999, Plaintiff appears to be a "self-proclaimed" medical expert which

obviously perpetuated his constant complaints to Defendants for surgery. However, "[m]ere

disagreements over medical judgment do not state Eighth Amendment claims." White v.

Napolean, 897 F.2d 103, 110 (3d Cir. 1990). Additionally, a prisoner's subjective dissatisfaction

with his medical care also does not constitute a claim of deliberate indifference. Andrews v.

Camden County, 95 F. Supp.2d 217, 228 (D. N.J. 2000). To the extent that Plaintiff disputes the

conservative course of treatment provided in this case, this claim must also fail. See Inmates of

Allegheny County Jail, 612 F.2d at 762 ("Courts will disavow any attempt to second-guess the

propriety or adequacy of a particular course of treatment [which] remains a question of sound

professional judgment.").

---

[3] Plaintiff also alleges that certain "unnamed members" of the URC exercised deliberate
indifference to his medical needs. Second Amended Complaint at Count Two, ¶¶ 73-78.
However, he neglects to specifically name each of the URC members. Such generalized pleading
fails to meet the second element of a valid Eighth Amendment Claim - that a "'prison official
must have a sufficiently culpable state of mind'" showing deliberate indifference. Beers-Capital,
256 F.3d at 125 (quoting Farmer, 511 U.S. at 834). This standard clearly encompasses the
subjective state of mind of a particular prison official, not a generalized group of unnamed
members sitting on a review committee. Id. Dismissal of "unnamed" URC members is
appropriate.

Even if the Court considered the merits of Plaintiff's disagreements with his medical providers, the record demonstrates that Defendants' course of treatment was entirely reasonable and executed with sound medical judgment.  First of all, there is no evidence that surgery was ever mandated or absolutely necessary.  Although two physicians stated that it was a "possibility" and "offered" this prescribed treatment, there was no indication that Defendants' conservative course of treatment was unacceptable.  Att. B at 34, 56.  Defendants were well-aware of the risks inherent with any back surgery (i.e., spinal ostelmyelitis, scarring, diminished spine stability) and its inconsistent outcomes.  See Att. C at ¶¶ 8 (Dr. Beam stating that "surgery is an option of last resort"), 9 ("[B]ack surgery is not a sure cure no matter if the surgery is performed immediately after an injury or many months after pursuing conservative treatment"), 38 ("laminectomy procedures are not optimal because the surgery typically diminishes the stability of the spine"); Att. D at Dr. Welch ltr. dtd. 4-18-08 ("There could be no guarantee that surgery, even if performed early in the patient's course, would have prevented these residual [] symptoms"); Att. B at 56 (Dr. Gilman explaining that he discussed "the risks and benefits" of surgery with Plaintiff).  Indeed, Plaintiff's own surgery in March 1999 is a perfect example.  Although there are indications that the surgery may have provided temporary pain relief, Plaintiff also testified that he has permanent damage and decreased mobility and strength - conditions that his surgery never cured.  Att. A at 29-30.  It is also important to note that Plaintiff has offered no evidence, by expert witness or otherwise, to demonstrate that surgical intervention was absolutely necessary or even the preferred course of treatment in this case.

There is also evidence that Plaintiff quite possibly exacerbated his painful condition by refusing to take prescribed medications at various times.  See, e.g., Att. C at ¶¶ 35, 40, 41.  Here again, Plaintiff is acting like a physician following only those treatments that he believes are

17

proper. Such conduct must weigh heavily against his argument of mistreatment on the part of Defendants.

Finally, and perhaps most importantly, the best evidence that the medical care in this case was proper is found in the fact that Plaintiff's herniation had completely resolved itself after following the conservative course of treatment prescribed by Defendants. Att. B at 71, 75. See also Att. C at ¶ 7 ("[I]t is perfectly acceptable within the medical community to treat back injuries, such as Mr. Cooleen's, with a conservative course of treatment."); Att. D at Dr. Welch ltr. dtd. 4-15-08 ("Specifically, most patients with sciatica due to a disc rupture do not require surgery and are treated with modalities such as bed rest and anti-inflammatories"). Simply stated, Plaintiff's disagreements over the course of treatment for his back injury do not rise to a cognizable Eighth Amendment claim.

### 4.    Plaintiff's Accusations of Purposeful Delay and Denial of Medical Treatment Are Unsubstantiated and Fail to Rise to a Constitutional Violation.

The Third Circuit has raised concerns regarding Plaintiff's accusations of delay or denial of recommended treatments and whether they amount to a constitutional violation. See Cooleen, 248 Fed. Appx. at 360-61. The Third Circuit has identified three specific instances that raise questions: (1) the URC's alleged rejection of Plaintiff's initial MRI; (2) the alleged delay in scheduling Plaintiff for surgery; and (3) the alleged cancellation of a follow-up appointment with neurosurgeon Dr. Gilman. Id.[4] During his deposition, Plaintiff confirmed that his deliberate indifference claim encompasses these grounds. See Att. A at 70-71.

_____

[4] The Third Circuit expressed additional concern over the accuracy of Dr. Beam's declaration. Cooleen v. Lamanna, et al., 248 Fed. Appx. at 360-61. This declaration has been resubmitted after thorough revision, correction, and specific citation to the medical record. Att. C.

A delay or denial in medical treatment does not necessarily invoke the Eighth

Amendment. As the United States Court of Appeals for the Second Circuit stated:

> Although a delay in providing necessary medical care may in some
> cases constitute deliberate indifference, this Court has reserved such
> a classification for cases in which, for example, officials deliberately
> delayed care as a form of punishment; ignored a "life-threatening and
> fast-degenerating" condition for three days, or delayed major surgery
> for over two years. No such circumstances are present here . . . That
> [Plaintiff] feels something more should have been done to treat his
> injuries is not a sufficient basis for a deliberate indifference claim.

Demanta v. New York State Correctional Dep't of Health Servs., 198 F.2d 233 (2d Cir. 1999).

In the Third Circuit, claims of deliberate indifference have been recognized in at least five

scenarios:

> First, where prison authorities deny reasonable requests for medical
> treatment and such denial exposes the inmate to undue suffering or
> the threat of tangible residual injury, deliberate indifference is
> manifest. Second, short of absolute denial, if necessary medical
> treatment is delayed for non-medical reasons, a case of deliberate
> indifference has been made out. Third, deliberate indifference is
> also evident where prison officials erect arbitrary and burdensome
> procedures that result in interminable delays and outright denials of
> medical care to suffering inmates. Fourth, [p]rison officials may
> not . . . opt for an easier and less efficacious treatment of the
> inmate's condition. Fifth, deliberate indifference is demonstrated,
> when prison authorities prevent an inmate from receiving
> recommended treatment for serious medical needs or deny access
> to a physician capable of evaluating the need for such treatment.

Bennet v. Division of Immigration Health Services, et al., 2006 WL 845864 at n.6 (E.D. Pa.

Mar. 28, 2006) (citing Monmouth County, 834 F.2d at 346-47) (internal citations and quotes

omitted) (emphasis added). In this case, none of the delay, denial, or cancellation concerns that

are highlighted above meet the deliberate indifference standards as recognized by the Third

Circuit in Monmouth County.

First, Defendants' conduct regarding the initial MRI was entirely appropriate. After Dr. Soares recommended the MRI on July 10, 2002, action was immediately taken - the very next day - by Dr. Beam when he reviewed the recommendation and forwarded it to the URC for consideration. Att. C at ¶ 21. Because the situation was not life-threatening, the URC was not required to act upon the MRI request within a condensed time period. Id. at ¶ 33. Nonetheless, the MRI was approved by the URC within 30 days of the initial recommendation (i.e., August 2, 2002), and the MRI was ultimately conducted on August 21, 2002. Id. at ¶¶ 29, 32. This was an entirely timely response given the circumstances. In the BOP system, any diagnostic procedure must be taken to the URC where consideration is given not only to the medical concerns of the inmate but also the security issues involved in transporting the inmate outside the prison and the scheduling issues inherent with busy civilian physicians. Id. at ¶ 33. On the timeliness of the BOP's response, Dr. Beam's observation is particularly instructive: "A time period of less than two months for a non-urgent MRI is very prompt in the prison system and even when compared to practice in mainstream HMO medicine." Id. Accordingly, the evidence does not support a constitutional violation for the alleged delay surrounding Defendants' response to the first MRI recommendation.[5]

Second, the steps taken prior to sending Plaintiff to surgery were also appropriate and do not amount to the reckless or intentional misconduct necessary for an Eighth Amendment

---

[5] The Third Circuit indicated that "[t]he Utilization Review Committee initially rejected the procedure, and Cooleen did not have the MRI until August 21, 2002." Cooleen, 248 Fed. Appx. 357, 361. In making this statement, the Third Circuit cited the R & R which referred to the Beam Declaration at ¶¶ 22-23. See R & R at p. 7. This portion of the declaration has now been clarified with specific citations to the medical record that indicate the URC never "denied" the initial MRI recommendation.

violation. There is no dispute that Dr. Soares, on September 4, 2003, mentioned that surgery was a "possibility" and that Plaintiff advocated for this procedure continuously. Att. B at 34. However, surgery was never <u>mandated</u> by any physician, nor is there evidence that it was absolutely necessary in Plaintiff's case. He was progressing favorably with the conservative course of treatment prescribed by Dr. Beam and was even seen walking on the track without any apparent difficulty. <u>Id.</u> at 44. Although Plaintiff experienced pain, this is not uncommon with back injuries during the recovery period, and perhaps if Plaintiff did not decline his medication, his pain symptoms would not have been as pronounced. Att. C at ¶ 5. Simply stated, aside from Plaintiff's self-serving declarations, there is no independent evidence of undue suffering or the threat of tangible residual injury as a result Defendants' conservative course of treatment. <u>See Monmouth County</u>, 834 F.2d at 346-47.

Moreover, surgical intervention comes with no guarantees of relief, and in some cases, additional problems such as paralysis or spinal osteomyelitis may result. Att. C at ¶ 8. Even Defendants' independent medical expert agreed that the conservative course of treatment (<u>i.e.</u>, bed rest and anti-inflammatories) is acceptable in most cases and that the standard of care provided in this case was above and beyond that normally received by most patients. Att. D at Dr. Welch ltr. dtd. 4-15-08. According to Dr. Beam, surgical intervention would only be immediately necessary in this case if Plaintiff presented with "'cauda equina' which is a massive herniation of a disk that is impinging upon a nerve to the bladder or anal sphincter or significant extremity muscle weakness." Att. C at ¶ 38. Plaintiff did not have these conditions. <u>Id.</u> Again, the best justification for Defendants' actions is the fact that the prescribed course of treatment

21

was ultimately successful because Plaintiff's disk hernation was cured.  Under the facts of this

case, there is no question that Plaintiff's treatment was entirely appropriate.

Finally, the circumstances surrounding the cancellation of Plaintiff's follow-up

appointment with Dr. Gilman were entirely justified.  This cancellation should not suggest that

Plaintiff was deprived of follow-up treatment - quite the opposite.  The consult with Dr. Gilman

was cancelled because Plaintiff had the services of orthopedist, Dr. Soares, who would continue

to monitor Plaintiff during his routine visits to FCI McKean.  Att. B at 81 (consult with

Dr. Soares on August 20, 2003); Att. C at ¶ 56.  This resource, right in the prison facility,

obviated the need to transport Plaintiff outside the prison to Erie which always presents security

issues.  Id.  Moreover, after the appointment with Dr. Gilman was denied, Plaintiff was followed

closely by medical staff at FCI McKean.  See Att. B at 77, 80 (medical notes from appointments

on June 25, 2003, and July 22, 2003).  It is important to remember that there was no urgent

medical necessity for treatment by Dr. Gilman at this point because an MRI confirmed the fact

that Plaintiff's hernation relieved itself.  Accordingly, Plaintiff was not entitled to the services of

a particular physician of his choice, only one that could competently examine his condition and

follow his progress.  See Rosales v. Coughlin, et al., 10 F. Supp.2d 261, 264 (W.D. N.Y. 1998)

("[C]ourts have repeatedly held that a prisoner does not have an absolute right to the treatment of

his choice.") (citing cases).  Accordingly, the cancellation of the Dr. Gilman appointment does

not include the reckless disregard by Defendants that is necessary to support a constitutional

violation.

E.    **Defendants Are Entitled to Qualified Immunity.**

A federal government employee is generally entitled to immunity from suit for personal damages if his or her conduct does not "violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  See Siegart v. Gilley, 111 S.Ct. 1789 (1991); Anderson v. Creighton, 483 U.S. 635 (1987); Mitchell v. Forsyth, 472 U.S. 511 (1985); Davis v. Scherer, 468 U.S. 183, 197 (1984). The qualified immunity defense in this context is "an immunity from suit rather than a mere defense from liability."  Mitchell v. Forsyth, 472 U.S. at 526.  Thus, the Supreme Court has repeatedly stressed the desirability to resolve the qualified immunity issues at the earliest stage of litigation.  Hunter v. Bryant, 112 S.Ct. 534, 536 (1991); Anderson v. Creighton, supra; Mitchell v. Forsyth, supra.

In a qualified immunity analysis, the first question is whether the record contains facts sufficient to permit a jury to find an Eighth Amendment violation (i.e., facts sufficient, when taken in the light most favorable to Plaintiff, to show that Defendants acted with deliberate indifference to his health or safety).  Saucier v. Katz, 533 U.S. 194, 199 (2001).  In the case at hand, Plaintiff's factual allegations, even if proven, would not establish an Eighth Amendment violation.

A reasonable jury could not find that Defendants acted with deliberate indifference because the undisputed facts show that Defendants took reasonable measures to address Plaintiff's complaints of low back pain.  Multiple attempts were made to examine and treat Plaintiff, and an appropriate, conservative course of treatment was pursued.  Defendants responded to Plaintiff's complaints by prescribing analgesics and anti-inflammatory medications,

23

referring him to an orthopedist for trigger-point injections and giving him medical restrictions of no work. Indeed, the treatment was a success, as the results of Plaintiff's second MRI indicated that his disk herniation was resolved. Accordingly, there is no evidence that the Defendants acted with deliberate indifference to Plaintiff's complaints regarding his low back pain.

Even assuming, however, that Plaintiff has alleged facts sufficient to support his claim of an Eighth Amendment violation, Defendants are entitled to the defense of qualified immunity pursuant to the second prong of <u>Saucier</u>: reasonable officers in the Defendants' position would not have clearly understood that they were violating Plaintiff's Eighth Amendment rights. <u>See</u> <u>Saucier</u>, 533 U.S. at 199. A reasonable jury could only conclude that it was not clear to Defendants that their conduct was unlawful. Low back pain or a herniated disk generally resolves itself with simple measures. Both surgical and non-surgical (conservative) treatment options are acceptable. Conservative treatment is successful in 90% of cases. Defendants took concrete steps to address Plaintiff's complaints, and, even if they were mistaken in their belief that the complaints had been adequately addressed, a reasonable jury could only conclude that the mistake was reasonable. <u>Id</u>.

Accordingly, under the facts as alleged in the Second Amended Complaint, each of the named Defendants is entitled to qualified immunity, and that portion of the Second Amended Complaint that purports to state a <u>Bivens</u> claim against them should be dismissed.

## <u>CONCLUSION</u>

For the foregoing reasons, Defendants' Memorandum of Law in Support of Their Motion to Dismiss Plaintiff's Second Amended Complaint or, in the Alternative, Motion for Summary Judgment should be granted in all respects, and the Court should grant such other and further relief as the Court may deem just and proper.

Respectfully Submitted,

MARY BETH BUCHANAN
UNITED STATES ATTORNEY


By:     s/Paul D. Kovac
        PAUL D. KOVAC
        Assistant U.S. Attorney
        Western District of Pennsylvania
        U.S. Post Office & Courthouse
        700 Grant Street, Suite 4000
        Pittsburgh, PA 15219
        (412) 894-7489


Dated:  May 23, 2008

25

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 23rd day of May, 2008, I electronically filed and served via first-class U.S. Mail, a true and correct copy of the foregoing Defendants' Memorandum of Law in Support of Their Motion to Dismiss Plaintiff's Second Amended Complaint or, in the Alternative, for Summary Judgment to the following:

> Mr. Timothy Cooleen
> 8777 Chautauqua Road
> Fredonia, NY 14063

> <u>s/Paul D. Kovac</u>
> PAUL D. KOVAC
> Assistant U.S. Attorney