# Attachment A

```
                                                                    1

          IN THE UNITED STATES DISTRICT COURT

        FOR THE WESTERN DISTRICT OF PENNSYLVANIA

                         - - -

TIMOTHY COOLEEN,                    )
                                    )
         Plaintiff,                 )
                                    )   Civil Action
    vs.                             )   No. 04-63 Erie
                                    )
JOHN LAMANNA, et al.,               )
                                    )
         Defendants.                )

                         - - -

            Deposition of TIMOTHY COOLEEN

            WEDNESDAY, JANUARY 16, 2008

                         - - -
```

     The deposition of TIMOTHY COOLEEN, called as a witness by the defendants, pursuant to notice and the Federal Rules of Civil Procedure pertaining to the taking of depositions, taken before me, the undersigned, Liana S. Dudek, Notary Public in and for the Commonwealth of Pennsylvania, at the offices of the United States Attorney's Office, 17 South Park Row, Room A-330, Erie, Pennsylvania 16501, commencing at 11:16 a.m., the day and date above set forth.

                         - - -

             COMPUTER-AIDED TRANSCRIPTION BY
               MORSE, GANTVERG & HODGE, INC.
                  PITTSBURGH, PENNSYLVANIA
                       412-281-0189

                         - - -

                       ORIGINAL

13

1  check in date; right?
2     A.    Yeah, yeah.
3     Q.    And just to give me a brief background of your
4  conviction, what were you convicted of?
5     A.    Possession with intent.
6     Q.    Of drugs?
7     A.    Yes.  Cocaine specifically.
8     Q.    And what is the conviction date or year?
9     A.    That would be 2000 -- 2000 -- well, I pled guilty in
10 late 2000.  I don't know if they fully accepted it until I was
11 sentenced in early 2001.
12    Q.    So you were sentenced in early 2001, and what court was
13 that?
14    A.    Western District of New York.
15    Q.    Is that Buffalo?
16    A.    Buffalo.
17    Q.    And --
18    A.    New York.
19    Q.    -- what were the time periods charged --
20    A.    That's New York.
21    Q.    -- for the crimes?  Was it from late '98 to 2000, do
22 you remember?
23    A.    Their investigation went from late '98, but unlike a
24 conspiracy charge, it was merely -- it was strictly a possession
25 charge.  That was what I pled to.

1  Q.  So you pled to one count --
2  A.  Yeah, possession with intent.
3  Q.  -- possession with intent to distribute cocaine?
4  A.  Yes.
5  Q.  And so they tacked on the intent to distribute by the
6  volume of cocaine you had on you; correct?
7  A.  Yeah.  Well, the volume that they said that I had,
8  yes.
9  Q.  Okay.
10 A.  There was a little discrepancy there, but I didn't
11 argue it because I was advised not to.
12 Q.  And you were arrested, I imagine?
13 A.  Yes.
14 Q.  And prior to your trial, were you in pretrial
15 confinement or --
16 A.  Oh, no.  I bailed out -- I was arrested Friday, bonded
17 out Monday.
18 Q.  And then you had your trial date?
19 A.  No, prelim hearing.  Right in my arraignment I
20 expressed my interest in pleading guilty, so there was never
21 really even a trial in the works.  It was strictly coming to a
22 plea agreement.
23 Q.  So after you pled guilty up until the time of your
24 sentence, were you incarcerated?
25 A.  No.

15

1  Q.  So the first time you were incarcerated was April 16,
2  2001 when you self-surrendered?
3  A.  No. I was held when I was arrested for three days.
4  Q.  For three days. And besides that?
5  A.  That was -- that was it.
6  Q.  Okay. And so what was your sentence?
7  A.  60 months, followed by three years of supervised
8  release.
9  Q.  And the 60 months began on April 16, 2001?
10 A.  Yes.
11 Q.  And you were ordered to self-surrender to McKean?
12 A.  Yep. At my sentencing I was given a -- they said it
13 would be approximately six weeks I'd get a letter from the U.S.
14 Marshals and then to follow their instruction date, which I did,
15 and turned myself into the front gate of the prison.
16 Q.  And what was your release date back then when you
17 initially went in?
18 A.  Well, when they figure out your release date, they
19 already build in your good time later to take it away from you
20 if, in fact, they need to. So my release date would have been
21 August 19, 2005.
22 Q.  Okay. And did you have any good time taken away?
23 A.  No.
24 Q.  So when were you actually released from whatever
25 prison?

1    Q.    Home.  They said that --

2    A.    Well, it was in the home.  It was definitely in the
3 home.  They found it in my kitchen drawer.

4    Q.    And how much did they charge you with?

5    A.    The charged me with 500 grams or more, although there
6 was less than that, but --

7    Q.    How much is that?  Does that fit in a freezer bag?

8    A.    It's a pound, yeah.

9    Q.    Okay.

10   A.    And, you know.

11   Q.    So you're still looking for employment, for places that
12 will accept your background?

13   A.    Well, that's the hard part, you know.  So, I mean, I --
14 occasionally I step in and cook when there's scheduling problems
15 with the employees.  I mean, I do what I can, you know.

16   Q.    Well, let's talk about your case, and here I guess it
17 all starts perhaps with a back injury in 1999.  Can you explain
18 to me a little bit around the circumstances surrounding that?

19   A.    Sure.  June of '93 there was a hit and run while I was
20 in Canada, and it was investigated by the Ontario Provincial
21 Police.  A lady ran a stop sign.  I didn't have a stop.  It was
22 a country lane.  There was horse fencing.  Couldn't even see her
23 coming.  And as I entered the intersection, she flew through it
24 about 50, 60 miles an hour, took the bumper wrap off my car and
25 sent me spinning down the road.  I did about 580 feet spinning

26

1    Q.    What side?
2    A.    Left. I believe left and right as a matter of fact.
3 To be honest, I mean, this is 1993. It's a little rough.
4    Q.    And it was like lower back area?
5    A.    No, no. It was straight sciatic. It was straight,
6 like, down the leg, like, ass cheek, back of the knee, side of
7 the shin, you know. You know, I'm trying to think whether it
8 was just -- I couldn't tell you if it was both sides or one
9 side. It kind of -- I went and had it looked at, but, you know,
10 basically they said give it a little while, and, you know, after
11 a couple weeks it just toned down. So I -- but it had to have
12 been from the car wreck. I mean --
13   Q.    So from your June 1993 car wreck until the surgery in
14 '99, did it tone down? Were there times where it flared up? Or
15 describe the injury from during that period.
16   A.    From that point on there was about a half a dollar size
17 ache right below my belt line localized, like a permanent bruise
18 kind of.
19   Q.    And that stayed with you all the time?
20   A.    Yeah, right side. And then '99 I don't know how it
21 happened, I went to get out of bed one day and couldn't walk. I
22 mean, like couldn't lean on my foot, couldn't -- it was
23 excruciating. And I had an MRI. The technician came out, and
24 he's like this is probably the worst herniation I have ever
25 seen.

1 severed some nerves that service my right leg.
2    Q. And what did the doctor do to correct that?
3    A. He removed the fragment, sutured the dura of the spinal
4 cord, and then did a diskectomy, which is the partial removal of
5 bone and then a partial removal of disk material to back it off
6 of the impinged nerves.
7    Q. And how long did it take you to recover from that
8 surgery?
9    A. Fully? I mean, there's -- I have a permanent 20
10 percent -- I can't -- there's certain nerves that are gone in my
11 leg. I mean, I can show you. I have -- my interior calf muscle
12 is atrophied. The ability to raise up my toes is gone. I can
13 assist with the other side, but to try to lift up on one foot --
14 I mean, for the first probably six or eight months because I
15 can't control the -- I can roll my ankle. I can't stop it
16 because that muscle --
17    Q. On the right side?
18    A. On the right side.
19    Q. So are you saying then as a result of the surgery
20 there's some permanent damage, so to speak?
21    A. No. As a result of the injury. The surgery cleared a
22 lot of the -- it eliminated all the pain. I mean, there was a
23 piece of a disk actually digging through my nerves, you know.
24 He actually sat -- I think at that point I was taking 10 Vicodin
25 a day, and it was just to get me functional through until I had

30

surgery, and he actually said something along the lines of pain like that kills most people. Because, I mean, it was literally a piece of something in -- imagine, like, raw nerves being sawed away. It's pretty bad. I couldn't even just --

Q. So besides the Vicodin, were you taking anything else to, like, relieve the pain?

A. No, no. That was it. Other than the injection, which was anti-inflammatory, which, you know, that got me functional enough to be moved and -- for my surgery, which happened, I don't know, three weeks later, I believe.

Q. So without the surgery, what did the doctor tell you, if anything?

A. Basically, it would not have healed itself and more damage would have occurred because that fragment could have continued to move, because the annulus is a very -- it's a fibrous -- like a cartilage. It doesn't have blood running through. It's not like tissue. It's actually kind of like -- the way to describe it would be almost like a softer version of fiberglass. It's like -- I don't know whether it's cartilage fibers, but it's cartilage and it actually fragmented.

Q. So your physical mobility was restricted, in part, after the surgery?

A. I had a limp, a limp.

Q. And does that continue today?

A. Oh, yeah, yeah, there's no fixing it. It's -- right

1  side's got -- it's -- I've had people tell me, you know, you're
2  limping really bad today, you know.
3      Q.   Does it flare up, the pain, or is there any pain
4  associated with the limp?
5      A.   Not -- no.  It's just -- I mean, I have pain that
6  occasionally -- from, I'm assuming, the newer injury because
7  it's above it that flares on the right side, but not like -- not
8  like in 1999.  That was a whole different animal.  That ran
9  through, like, the back of my leg into the inner side of my calf
10 and, I mean, I have three numb toes, numb heel, you know, half
11 the outside edge of my foot is numb on the right.
12     Q.   So after the surgery and the healing was done up until
13 the time of the injury which is the basis of this complaint, are
14 you saying that the pain, for the most part, was relieved?
15     A.   Oh, absolutely, yeah.  I mean, I was working in McKean
16 when I first got there -- I believe, because of my injury, they
17 had me tasked as a driver, which was not a problem.  Then after
18 a couple other drivers were implicated in a -- it was like a
19 gambling ring or something, they basically locked up everybody.
20 After that, after a 30-day investigation, I got out of seg and
21 then they put me into a maintenance department because of my
22 prior painting and construction kind of stuff.
23     Q.   Were you able to lift at all?
24     A.   Oh, absolutely, yeah, yeah.
25     Q.   So there wasn't restrictions.  It was just kind of a

37

1 year later.  I was in jail a year after that.  I still had a
2 really bad limp and, you know, it was -- I think they were
3 accommodating that, but after the driving thing, there were very
4 few options.  You know, I -- you know, so my background was in
5 maintenance, or actually painting, so they thought that might be
6 a great idea, which is exactly how I hurt my back.
7     Q.    Well, let's talk about that.  It was March 21, 2002 is
8 the injury date; correct?
9     A.    Yeah.
10    Q.    And just describe how the injury occurred.
11    A.    I was painting the human resources offices with a
12 partner, Michael DaCunto, and --
13    Q.    Is he still there?
14    A.    No, no.  He was in and out probably a year, financial
15 thing.
16    Q.    White collar criminal?
17    A.    Yeah, yeah, but a plumber by trade.
18    Q.    A what?
19    A.    A plumber.
20    Q.    Oh, okay.
21    A.    So, hence, the maintenance department.  And we were
22 painting the human resources offices, and they have very big,
23 like, wall units and stuff and we had to move them away.
24 Painting no problem.  They had one of those very big oak
25 pigeonholes, you know, for letters and --

38

1    Q.    Like shelving-type thing?

2    A.    Yeah, for different forms and envelopes and, you know.

3    Q.    It was heavy?

4    A.    Heavy. Moved it not a problem.

5    Q.    Yourself or with Michael?

6    A.    No. With Michael. Moved it, painted behind it, went
7 to move it back and I felt a stab on my left side, really like
8 someone ice picked me, and I, like, went to my knees
9 immediately.

10    Q.    So when you -- did you bend down to pick it up or would
11 you move it from the top of the shelf?

12    A.    It was -- we just slid it over. I -- if I remember
13 correctly, we had to lift it so we wouldn't scratch up the top
14 of the -- because it was like a recessed, you know, and we
15 didn't want to -- it was, like, black and, you know.

16    Q.    And the pain this time occurred on your left side?

17    A.    No.

18    Q.    A totally different area from the previous side?

19    A.    Yeah.

20    Q.    From your previous back surgery?

21    A.    Absolutely.

22    Q.    So it was a left side injury?

23    A.    Yeah.

24    Q.    And it radiated down your left foot?

25    A.    Left leg.

39

1    Q.    Left leg?

2    A.    Yeah.

3    Q.    Nothing with the right?

4    A.    No, not that I recall. This was -- the stab was bad
5 enough, but then the sciatic, if you've ever had any kind of
6 sciatic pain, it's ungodly. It's like a three-foot toothache.
7 It throbs. It -- there's crushing pain. Then I started getting
8 weird, like, hot/cold, bugs running, all kinds of, like, weird
9 nerve --

10   Q.    Down the left side of the leg?

11   A.    Yeah.

12   Q.    And where was the stab, lower back on the left side?

13   A.    Like, actually right about the belt line, maybe about
14 an inch above it.

15   Q.    On the left side in the back?

16   A.    On the left side, yeah.

17   Q.    And the pain shot all the way down to the tops of the
18 toes?

19   A.    Within a couple days. Within by, like, Saturday I
20 couldn't sit, because I went -- the injury was on a Thursday.
21 My maintenance CO was on vacation. I believe it was a NASCAR
22 weekend, and there was nobody really to report it to. And I was
23 kind of thinking okay, this might go away, you know.

24   Q.    Were you in bed at this time right after the injury?

25   A.    No, no. I went to work the next day. And then

70

1    A.   Yeah, chief medical officer.  He's another
2 administrative medical staff.
3    Q.   And defendant Montgomery is the PA?
4    A.   Yes.
5    Q.   So all of these defendants you're still claiming that
6 deliberate indifference claim to one degree or another against
7 them; correct?
8    A.   Yes.
9    Q.   And although, you know, I kind of have a fairly good
10 idea, the basic grounds are the denial for request for
11 treatment?
12    A.   Yes.
13    Q.   The delayed treatment; correct?
14    A.   Yes.
15    Q.   Canceling various appointments; correct?
16    A.   Yes.
17    Q.   And is there any other kind of basic general grounds?
18    A.   Yeah, failure to -- to have somebody qualified to
19 evaluate me, and let's see.  The failure to have a qualified,
20 you know, individual who is qualified to evaluate the injury,
21 denial of prescribed treatment, delay of prescribed treatment,
22 and failure to -- to do the proper diagnostic procedures early
23 on.
24    Q.   So that encompasses the basic grounds of this
25 deliberate indifference claim?

71

1    A.    Basically, unless there's another one in there that I
2 may have missed, you know, off the top of my head, but that's
3 the --
4    Q.    General?
5    A.    And other than Klark, who exacerbated the situation not
6 through denial of treatment, but removing my commissary and food
7 assistance knowing that I was unable to carry it and making
8 matters worse that way.  He was not a medical person, but he was
9 certainly in through every step from the 9 and the 10 right up
10 to my transfer.
11    Q.    So we're just talking about defendants at McKean during
12 the -- from the injury up until the time of your transfer;
13 correct?
14    A.    Yes.
15    Q.    And as far as present day is concerned, the impact from
16 this injury and all this delay in treatment and the grounds you
17 allege upon you personally is you have constant pain, is that
18 what you're alleging, inability to do certain tasks?
19    A.    Yeah.
20    Q.    Like what?
21    A.    I mean, literally lifting anything over -- I don't know
22 exactly, but even, like, 15 or 20 pounds.  It's -- like, if I go
23 to carry in any -- I mean, large garbage bags dragging it up the
24 hill to my house, and I throw it in a little kid's wagon,
25 picking things up, carrying things, extended sitting.  Like,