# Attachment C

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| TIMOTHY COOLEEN, | ) | |
| | ) | Civil Action No. 04-63E |
| Plaintiff, | ) | Hon. Sean McLaughlin, U.S.D.J. |
| | ) | Hon. Susan Paradise Baxter, |
| v. | ) | U.S.M.J. |
| | ) | |
| JOHN LAMANNA, et al. | ) | |
| | ) | |
| Defendants. | ) | |

## DECLARATION OF HERBERT BEAM, M.D.

I, Herbert Beam, M.D., declare as follows pursuant to 28 U.S.C. § 1746:

1. I am a board certified family physician currently employed as a staff medical doctor by the United States Department of Justice, Federal Bureau of Prisons ("BOP"), Federal Medical Center Devens, Massachusetts. I have been employed by the BOP since October 21, 2001. I have practiced medicine since 1981. My practice has involved the extensive treatment of back injuries. I have treated more than 2,000 patients with back pain in my career.

2. Prior to my current position, I was employed at the Federal Correctional Institution ("FCI") McKean, Pennsylvania as a physician. While at FCI McKean, I had access to inmates' medical files and records in the ordinary course of my duties. I was responsible for providing diagnostic, preventive and therapeutic services to inmates at FCI McKean. Additionally, I

supervised and provided guidance to nurses, physician assistants and other ancillary support staff.

   3.   I have reviewed the Second Amended Complaint filed by Mr. Cooleen, a former federal inmate. I understand that Mr. Cooleen is alleging that medical staff at FCI McKean were deliberately indifferent to his medical needs by, among other things, delaying and/or denying certain treatment for his low back injury.

I.   **The Treatment of Low Back Pain**

   4.   During the twenty-six years that I have practiced medicine, I have cared for patients with low back pain, a condition which affects four out of five people. There are both non-surgical (conservative) and surgical options for the treatment of low back pain.

   5.   Conservative treatment is successful in most cases. Generally, under the conservative course of treatment, back pain will resolve itself gradually with simple measures such as bed rest; over-the-counter pain relievers; muscle relaxers, analgesics and anti-inflammatory medications; short walks and controlled physical activity. Often times, back injuries are slow to heal and require many months of limited activity and conservative treatment measures in order to obtain manageable relief. During the recovery time, back injuries are often accompanied by intense pain and difficulty with physical

2

movement. Despite this discomfort, treating back injuries conservatively does not present an increase risk of harm or further damage to the back.

6. Steriod injections are an accepted method of treatment and have lessened nerve irritation and pain in some cases.

7. About 90% of patients with low back pain or a herniated lumbar disc improve without surgery. Although surgery in some cases may be recommended as an option by other physicians (typically those with more aggressive philosophies regarding treatment), it is perfectly acceptable within the medical community to treat back injuries, such as Mr. Cooleen's, with a conservative course of treatment.

8. If after a period of time the conservative treatment is unsuccessful, surgery is the option of last resort. Laminectomy, the traditional surgical procedure, involves removing a portion of the vertebral bone. As with any major surgery involving the back and spinal area, there are always inherent risks including at the most drastic level paralysis, spinal osteomyelitis (infection within the bone), or scarring all of which could result in long term pain.

9. In sum, back surgery is not a sure cure no matter if the surgery is performed immediately after an injury or many months after pursuing conservative treatment. Long-term outcomes are often similar following less-invasive treatments.

Accordingly, it has generally been my practice to first treat disc injuries conservatively.

II. **Overview of Mr. Cooleen's Treatment at FCI McKean**

    A. **The Injury and Initial Treatment**

    10. While at FCI McKean, Mr. Cooleen was one of my patients. I have reviewed the medical records pertinent to his allegations. See Attachment ("Att.") B (Medical records attached to Defendants' Memorandum of Law).

    11. Mr. Cooleen entered the BOP at FCI McKean in April 2001. Att. B at 1. The medical records indicate that he arrived with a history of high blood pressure. Id. at 2, 3. As a result, I saw him routinely in the Chronic Care Clinic at FCI McKean. Id. at 6,7,8. Additionally, Mr. Cooleen also had a history of lumbar disc disease. Id. at 2-5. Mr. Cooleen reported that he had surgery to repair a herniated disc in March 1999. Id. at 2, 5.

    12. On or about March 21, 2002, Mr. Cooleen allegedly injured himself while performing his prison work assignment. Att. B at 9. He reported that he "pulled [his] back" while moving some furniture. Id.

    13. According to his medical records, five days later, on or about March 26, 2002, Mr. Cooleen first reported the injury to Health Services at FCI McKean and complained of "mild discomfort" in his lower back. Id. at 9, 10.

4

14. Mr. Cooleen received Motrin for his back pain, and the nurse practitioner told him to alternate the application of hot compresses and then ice packs to his lower back. Id. at 9. He was also given several days off from his work assignment to rest and recuperate. Id. at 9, 11-14. A follow-up appointment was scheduled for April 1, 2002. Id. at 9.

15. Mr. Cooleen was seen again on April 1, 2002. Id. at 16. He was examined and appropriate medication. Id. He was also directed to place warm compresses on his back and remain idle through 4/3/02. Id.

16. On or about April 19, 2002, I examined Mr. Cooleen at sick call for complaints of, inter alia, low central back pain. Id. at 17. I offered to prescribe a nonsteroidal anti-inflammatory drug (NSAID), such as aspirin or ibuprofen (Advil, Motrin) for his back pain. Id. Mr. Cooleen declined. Id.

17. On or about May 3, 2002, I saw Mr. Cooleen again in Health Services for lower back pain. Att. B at 18. He claimed that the pain radiated down his left leg. Id. I observed that Mr. Cooleen had no difficulty walking. Id. I prescribed Motrin, advised Mr. Cooleen to continue walking, and told him to return in six weeks for a follow-up. Id. At this time, I was following a conservative course of treatment including medication and moderate exercise. I followed Mr. Cooleen closely and there was

no medical necessity for outside consultation at this early stage in his post-injury recovery.

18.  On or about June 12, 2002, I again examined Mr. Cooleen during the Chronic Care Clinic. Att. B at 20. He explained to me that he had "good days and bad days." Id. Mr. Cooleen stated that he was taking ibuprofen but he said it wasn't totally effective. Id. His lower back was tender. Id.

19.  On June 12, 2002, I advised Mr. Cooleen that I was considering referring him to an orthopedic consultant for treatment of his lower back pain but wanted to give his injury additional time to heal. Att. B at 20. Again, in my experience, injuries of this sort often relieve themselves if given appropriate time to heal (which in most cases is several weeks or months). I told him to return to the Chronic Care Clinic in three months. Id.

**B.  Referral to Orthopedic Consult and MRI Results of August 2002**

20.  On or about July 3, 2002, I referred Mr. Cooleen to Dr. Soares, an orthopedic consultant. Att. B at 22. Because of Mr. Cooleen's continual complaints, I wanted to assure him by outside consultation that he wasn't in danger of further injury.

21.  On or about July 10, 2002, Dr. Soares examined Mr. Cooleen and gave him a steriod injection. Att. B at 22. Such injections have a strong anti-inflammatory effect and can provide

substantial pain relief.  Dr. Soares also recommended an MRI of Mr. Cooleen's lower back.  Id.  On July 11, 2002, I reviewed Dr. Soares' recommendation and initiated the procedures for consideration by the Utilization Review Committee ("URC").

22.  On or about July 17, 2002, Ms. Gracia Fairbanks, a Physician's Assistant, examined Mr. Cooleen in his housing unit after he complained of severe pain.  Att. B at 24.  Mr. Cooleen stated that the injection he received from Dr. Soares, the orthopedic consultant, did not help.  Id.  Although he could walk to the bathroom with difficulty, Mr. Cooleen said he could not sit for meals in the mess hall.  Id.

23.  Ms. Fairbanks notified the Medical Director, Dr. Dennis Olson, of Mr. Cooleen's condition.  Id.  She gave Mr. Cooleen another injection for pain, and Dr. Olson prescribed Tylenol with codeine and Flexeril, a muscle relaxant.  Id.

24.  Two days later, on or about July 19, 2002, Ms. Fairbanks examined Mr. Cooleen again.  Att. B at 25.  She observed that he was walking slowly and cautiously.  Id.  Mr. Cooleen complained that the pain increased when he walked, but he said he was comfortable and pain free when he was lying down.  Id. He also said the pain radiated down his leg.  Id.

25.  Ms. Fairbanks prescribed Naprosyn for the pain and inflammation.  Id.  She told Mr. Cooleen to continue alternating between applying ice and heat packs to his back.  Id.

26. On that same day, July 19, 2002, Dr. Olson referred Mr. Cooleen for another examination by the orthopedic consultant. Att. B at 26. Dr. Olsen also noted that the MRI recommendation was referred to the URC. Id. at 24.

27. On or about July 24, 2002, Dr. Soares, the orthopedic consultant, examined Mr. Cooleen and gave him an another steriod injection for pain. Att. B at 26.

28. Dr. Soares again recommended an MRI and a possible referral to a pain management clinic or a neurosurgeon. Id.

29. On August 2, 2002, the URC unanimously approved the MRI procedure. Att. B at 28; see also id. at 27.

30. On or about August 16, 2002, I examined Mr. Cooleen during sick call. Att. B at 30. Before I examined Mr. Cooleen, the housing unit staff had told me that he had been in bed for two weeks and had only occasionally gotten up for meals. Id. I had sent pain medication to the housing unit the night before I examined him. Id.

31. Mr. Cooleen told me that the pain medication I prescribed took the edge off the pain but did not completely relieve it. Id. I advised Mr. Cooleen that he needed to walk to improve his back. Id. I also prescribed Neurotin, a pain medication directed at the nerves. Id.

32. On or about August 21, 2002, Mr. Cooleen had an MRI. Att. B at 31-33. The results revealed an acute herniated disc at L4-L5. Id. at 32.

33. Any recommendation for a diagnostic test such as an MRI that requires an inmate to travel outside of FCI McKean must be reviewed and, where appropriate, approved by the URC. Unless a procedure is medically urgent (not the case here), the URC must take time to consider the medical file and consultant's recommendation, coordinate with BOP security personnel for transport outside the prison to Erie, PA, and contact the outside consultant for available appointments. As explained above, Mr. Cooleen's MRI recommendation of July 10, 2002 was reviewed by me and referred to the URC on or about July 11, 2002. Att. B at 22. The URC approved the MRI on August 2, 2002. Id. at 27, 28. The MRI was ultimately conducted on August 21, 2002. Id. at 32. A time period of less than two months for a non-urgent MRI is very prompt in the prison system and even when compared to practice in mainstream HMO medicine.

34. After reviewing the MRI results on August 27, 2002, Dr. Olson referred Mr. Cooleen to the orthopedic consultant, Dr. Soares. Att. B at 32, 34.

35. I examined Mr. Cooleen on August 28, 2002. Att. B at 35. He told me that the injections and the Neurotin only slightly reduced his pain. Id. He also reported, however, that

9

he had not taken pain medication for several days and was "holding his own." Id.

36. I prescribed Tylenol with codeine and recommended that Mr. Cooleen see the orthopedic consultant again for a follow-up. Id.

C. **Continued Treatment September 2002 - March 2003**

37. On September 4, 2002, Dr. Soares examined Mr. Cooleen. Att. B at 34. Dr. Soares recommended that Mr. Cooleen be considered for a "possible" laminectomy, and he prescribed Tylenol with codeine for Mr. Cooleen's pain. Id. It is significant to note that surgery was never absolutely indicated based upon the lack of findings.

38. Dr. Soares recommendation was considered. However, laminectomy procedures are not optimal because the surgery typically diminishes the stability of the spine. Moreover, immediate surgery would only be indicated if Mr. Cooleen had "cauda equina" which is a massive herniation of a disk that is impinging upon a nerve to the bladder or anal sphincter or significant extremity muscle weakness. Mr. Cooleen did not have these conditions.

39. On September 11, 2002, I examined Mr. Cooleen's back condition. Att. B at 37. He appeared to be in pain, and I advised him to walk around and return in one week for a another exam and a medication refill. Id.

40. On September 23, 2002, Mr. Cooleen requested that his pain medication be discontinued. Att. B at 40. He denied any improvement in his back but he was walking and moving freely without any evidence of pain or discomfort. Id.

41. On September 25, 2002, I examined Mr. Cooleen in the Chronic Care Clinic. Att. B at 41. Overall, Mr. Cooleen was doing better: his back pain was stable, and he had stopped taking Tylenol with codeine. Id. I reminded Mr. Cooleen that he needed to be up and around and walking for his back condition to improve. Id. He did not request any additional pain medication. Id.

42. In October, 2002, the BOP's Medical Designations Section denied the request to transfer plaintiff to a medical center for a laminectomy. Att. B at 42. The BOP advised FCI McKean medical personnel to continue local treatment. Mr. Cooleen's condition had stabilized, and my physical examination indicated that the conservative treatment of his low back pain was progressing favorably. Id. at 43.

43. On October 16, 2002, my treatment of Mr. Cooleen continued by examining him in the Chronic Care Clinic. Att. B at 43. He reported that he had a new sensation in his left leg that felt like "bugs running up and down his left leg." Id. I explained to Mr. Cooleen that a sensation of this type is not unusual and that most herniated discs resolve themselves

11

satisfactorily without surgery. Id. The plan was to continue with his rest and conservative treatment and schedule a follow-up appointment in 6 weeks. Id.

44. On or about November 6, 2002, I observed Mr. Cooleen on the track at FCI McKean walking briskly with a fluid gait. Att. B at 44. When I approached him asked about his back, Mr. Cooleen told me that he felt "no better, no worse." Id.

45. On December 18, 2002, the BOP responded to Mr. Cooleen's request for surgery and allegations of inadequate treatment. Att. B at 45. The BOP indicated that surgery was not necessarily a "cure all" and should be used judiciously. Id. Mr. Cooleen was assured that he would be continually monitored and his treatment would be "developed" based upon future clinical findings. Id. Mr. Cooleen continued to disagree with our medical judgment. Id. at 46-47.

46. On or about December 24, 2002, I examined Mr. Cooleen for his follow-up appointment. Att. B at 48. Mr. Cooleen stated that he did not understand why he was not having surgery, and he claimed that he had been unable to sit down for months. Id.

47. Again, my physical examination of Mr. Cooleen did not support surgical intervention at this time. Id. I determined that he should continue with conservative treatment, and I scheduled another appointment at the next Chronic Care Clinic. Id.

48.  I saw Mr. Cooleen again on January 8, 2003.  Att. B at 49.  His physical examination still did not support surgical intervention. Id. I told Mr. Cooleen to continue with his diet and exercise. Id. Mr. Cooleen was, at the time, medically unassigned and thus did not have a work assignment. Id.

49.  In January, 2003, Mr. Cooleen submitted another request for an appointment with Dr. Soares to address the continued pain he experienced in his legs.  Att. B at 50.  I decided that it was appropriate at this time to refer Mr. Cooleen to a neurosurgeon for a consultation not because it was medically necessarily but more the result of Mr. Cooleen's continual persistence. Id. at 51.  I referred the matter to the URC for approval in February 2003. Id. at 51-52.

50.  On February 19, 2003, I examined Mr. Cooleen.  Att. B at 51.  I informed him that the URC approved the request to see a neurosurgeon for evaluation and possible surgery. Id. at 51, 52.

D.  **The Cancelled Surgery & Success of The Conservative Course of Treatment**

51.  On March 27, 2003, the neurosurgeon, Dr. Steven A. Gilman, examined Mr. Cooleen in Erie, Pennsylvania, and diagnosed a herniated disc with an L5 radiculopathy, based, in part, on Mr. Cooleen's MRI in August, 2002.  Att. B at 53, 56.  Dr. Gilman recommended another MRI to confirm the diagnosis. Id. at 56. Surgery was "offered" but, again, not indicated to be medically necessary. Id.

13

52.   On April 2, 2003, I examined Mr. Cooleen in the Chronic Care Clinic and advised him of the planned course of treatment to include the possibility of surgery.  Att. B at 57.

53.   Mr. Cooleen was admitted to Hamot Medical Center in Erie, Pennsylvania for an MRI and spinal surgery on or about May 13, 2003.  Att. B at 62.  A physical examination revealed that Mr. Cooleen's gait and station were "within normal limits" and that he had good strength in all of his amenities with positive straight leg raising on the left side.  Id. at 63.

54.   The results of the May 13, 2003 MRI revealed that the herniated disc had resolved itself.  Att. B at 71, 75.

55.   Under the circumstances, the neurosurgeon, Dr. Gilman, concluded that Mr. Cooleen's herniated disc had healed on its own, and, as a result, there was no need for surgery.  Id. at 75. Mr. Cooleen was discharged from the hospital on or about May 14, 2004.  Id. at 76.  Dr. Gilman suggested he be seen in three months "to see how he is doing."  Id. at 74.

56.   On or about June 18, 2003, the URC denied the request for a follow-up appointment with Dr. Gilman, the neurosurgeon, because the disc had resolved completely.  Att. B at 58, 76. Instead, Mr. Cooleen was provided with a follow-up appointment in the chronic care clinic.  Id. at 76.  In denying the follow-up with Dr. Gilman, the URC determined that it was not medically necessary to consult with this particular physician because FCI

McKean had the services of Dr. Soares, the orthopedist, who visited the facility on a routine basis. Mr. Cooleen was notified that we would continue to follow his case and, if he was having any problems, he was directed to sick call. Id. at 78. Finally, nonessential consultation with Dr. Gilman in Erie, PA would also entail the security concern of transporting Mr. Cooleen outside the facility, a risk not recommended unless absolutely necessary.

57. On July 22, 2003, C. T. Montgomery, a physician's assistant, examined Mr. Cooleen in the Health Services Department. Att. B at 80. Mr. Cooleen claimed that he was in pain 24 hours a day, and he demanded a follow-up appointment with the neurosurgeon. Id. Although he claimed his pain ranged from 5 to 9 on a scale of 10 most days, Mr. Cooleen refused pain medication and explained that he had aspirin. Id.

58. Mr. Cooleen's request for another appointment with the neurosurgeon was referred to the URC. Att. B at 81.

60. On August 20, 2003, Dr. Soares, the orthopedist, examined Mr. Cooleen for a follow-up appointment and recommended that he continue with conservative management. Id.

61. On or about September 15, 2003, the BOP transferred Mr. Cooleen to FCI Schuylkill where he was assigned to Regular Duty with a lifting restriction of 15 pounds. Att. B at 83, 87.

62.  On or about March 17, 2004, Mr. Cooleen had a second MRI, the results of which revealed there was no evidence of any recurrent disc herniation.  Att. B at 88.  The conservative course of treatment was successful.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on May 21, 2008.

                                        _____
                                             HERBERT BEAM, M.D.