**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**


TIMOTHY COOLEEN,               )
     Plaintiff                )
                              )
vs.                            )   **C.A.No. 04-63 Erie**
                              )   **District Judge McLaughlin**
JOHN LAMANNA, et al.           )   **Magistrate Judge Baxter**
     Defendants.              )


## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

_____

## I    RECOMMENDATION

_____It is respectfully recommended that the motion to dismiss or for summary judgment filed by Defendants [Document # 87] be denied.

It is further recommended that the motion for summary judgment filed by Plaintiff [Document # 85] be denied.

It is further recommended that the Clerk of Courts be directed to terminate the United States of America as a Defendant from this action.

By separate Order issued this day, the parties will be directed to file their pre-trial narrative statements.



## II    REPORT

### A.    Relevant Procedural History

Plaintiff, Timothy Cooleen, a former inmate who was incarcerated at the McKean Federal Correctional Institution in Bradford, Pennsylvania, filed this civil rights action pursuant to Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics, 403 U.S. 388 (1971), on March 1, 2004.  Plaintiff is representing himself in this matter.  Named as Defendants

1

are: John Lamanna, Warden; Gary Grimm, Associate Warden; Dennis Olson, Chief Medical

Officer; Mr. Menna (aka Memon), Hospital Administrator; Herbert Beam, Staff Physician;

Robert Klark, Camp Administrator; R. Smith, Chief Medical Officer; Todd Montgomery,

Assistant Health Services Administrator; unnamed members of the Utilization Review

Committee, all present or former employees of FCI - McKean; and the United States of

America.

This Court originally construed Plaintiff's Second Amended Complaint as raising the

following claims:

> Initially, Plaintiff alleged that Defendants LaManna, Grimm, Olson, Menna,
> Beam, Klark, Smith, Montgomery, and unnamed URC members denied him
> adequate medical treatment for a back injury sustained during a prison work
> assignment, thereby violating his Eighth Amendment right to be free from cruel
> and unusual punishment. Second, Plaintiff alleged that Defendants Olson, Beam,
> Montgomery, LaManna, Menna, Klark, and unnamed URC members violated his
> Fifth Amendment right to due process. Third, Plaintiff brought a claim under the
> Federal Tort Claims Act against the United States for the negligent acts of its
> employees.

See Document # 70.

Defendants filed a motion to dismiss or alternatively for summary judgment against the

Second Amended Complaint. In support of that motion, Defendants filed medical records.

Thereafter, Plaintiff filed an "emergency motion for the production of documents intentionally

or negligently omitted from an exhibit tendered by the Defendants." Document # 54. In that

motion, Plaintiff pointed out some discrepancies in the medical records produced by Defendants

in support of their dispositive motion. Defendants supplemented the record and purported to

include "an accurate copy of the medical records from April 2001 until December 2004."

Document # 66, Exhibit A, Certification of Roberta Truman, Assistant Regional Counsel for the

Federal Bureau of Prisons, ¶ 2.

On August 1, 2005, the undersigned Magistrate Judge issued a Report and

Recommendation recommending that the entire Second Amended Complaint be dismissed.

Document # 70. By Order dated August 30, 2005, District Judge Sean J. McLaughlin adopted

the Report and Recommendation. Document # 74. More specifically, this Court 1) dismissed

Defendants Menna, Grimm and Smith because Plaintiff failed to allege their personal

involvement; and 2) dismissed the FTCA claim for lack of subject matter jurisdiction because Plaintiff's injury was work-related and thereby precluded by the Inmate Accident Compensation Act. Further, this Court granted summary judgment on the *Bivens* and due process claims. Documents # # 70, 74.

Thereafter, Plaintiff appealed that decision to the United States Court of Appeals for the Third Circuit. On August 30, 2006, the Circuit denied the summary action motion with instructions for the parties to address in their briefs whether any **delays** in Cooleen's medical treatment violated the Eighth Amendment. Document # 80.

On September 14, 2007, the Third Circuit issued an Opinion affirming the District Court's dismissal of the due process and FTCA claims, but remanding the case with regard to Plaintiff's Eighth Amendment claim. Importantly, the Third Circuit characterized Plaintiff's Eighth Amendment claims a bit differently than this Court originally construed Plaintiff's claims. In its Opinion, the Third Circuit summarized:

> "Cooleen alleges that during the time from his injury to his transfer, prison officials delayed or refused necessary medical treatments, delayed or denied referring him to necessary specialists by not scheduling appointments or cancelling existing appointments, and cancelled previously-approved accommodations designed to lessen Cooleen's pain in obtaining and eating meals.[1] Cooleen also alleges that the Utilization Review Committee improperly denied various procedures and referrals, which he had no opportunity to challenge."

Document # 80-2, page 2. Specifically, the Third Circuit concluded that "the District Court's analysis did not address the issue of prison officials' delay or denial of recommended treatments ... [and] whether these instances amount to a constitutional violation." Document # 80. The Third Circuit identified three areas of concern regarding the delay and/or denial of treatment and specifically "remand[ed] to the District Court for a determination whether these instances amount to a constitutional violation." Id. at 6, 8.

Following the remand of this case, the parties engaged in discovery. Presently before this Court are cross motions for summary judgment. Plaintiff has filed a motion for summary

---

[1] Defendants do not move for summary judgment as to the issue of the cancelled accommodations.

3

judgment (Document # 85) and Defendants have moved to dismiss or in the alternative for summary judgment (Document # 87). Both parties have filed Opposition Briefs. Documents ## 90, 91. The issues are fully briefed and this motion is ripe for disposition by this Court.


**B.** **Standards of Review**

**1.** ***Pro Se* Litigants**

*Pro se* pleadings, "however inartfully pleaded," must be held to "less stringent standards than formal pleadings drafted by lawyers." Haines v. Kerner, 404 U.S. 519, 520-521(1972). If the court can reasonably read pleadings to state a valid claim on which the litigant could prevail, it should do so despite failure to cite proper legal authority, confusion of legal theories, poor syntax and sentence construction, or litigant's unfamiliarity with pleading requirements. Boag v. MacDougall, 454 U.S. 364 (1982); United States ex rel. Montgomery v. Bierley, 141 F.2d 552, 555 (3d Cir. 1969)(petition prepared by a prisoner may be inartfully drawn and should be read "with a measure of tolerance"); Smith v. U.S. District Court, 956 F.2d 295 (D.C.Cir. 1992); Freeman v. Department of Corrections, 949 F.2d 360 (10th Cir. 1991). Under our liberal pleading rules, during the initial stages of litigation, a district court should construe all allegations in a complaint in favor of the complainant. Gibbs v. Roman, 116 F.3d 83 (3d Cir. 1997). See, e.g., Nami v. Fauver, 82 F.3d 63, 65 (3d Cir. 1996)(discussing Fed.R.Civ.P. 12(b)(6) standard); Markowitz v. Northeast Land Company, 906 F.2d 100, 103 (3d Cir. 1990)(same). Because Plaintiff is a *pro se* litigant, this Court will consider facts and make inferences where it is appropriate.


**2.** **Motion to dismiss**

Rule 8(a) of the Federal Rules of Civil Procedure states that a pleading must set forth a claim for relief which contains a short and plain statement of the claim showing that the pleader is entitled to relief. A motion to dismiss filed pursuant to Federal Rule of Civil Procedure 12(b)(6) must be viewed in the light most favorable to the plaintiff and all the well-pleaded

allegations of the complaint must be accepted as true. Erickson v. Pardus, ___ U.S. ___, ___ 127 S.Ct. 2197, 2200 (2007); Neitzke v. Williams, 490 U.S. 319 (1989); Estelle v. Gamble, 429 U.S. 97 (1976). The issue is not whether the plaintiff will prevail at the end but only whether he should be entitled to offer evidence to support his claim. Neitzke; Scheuer v. Rhodes, 419 U.S. 232 (1974). As the United States Supreme Court recently held in Bell Atlantic Corp. v. Twombly, 550 U.S. ___, 127 S. Ct. 1955 (May 21, 2007), a complaint must be dismissed pursuant to Rule 12 (b)(6) if it does not allege "enough facts to state a claim to relief that is plausible on its face." Id. at ___, 1974 (rejecting the traditional 12 (b)(6) standard set forth in Conley v. Gibson, 355 U.S. 41 (1957)). The court must accept as true all allegations of the complaint and all reasonable factual inferences must be viewed in the light most favorable to plaintiff. Angelastro v. Prudential-Bache Securities, Inc., 764 F.2d 939, 944 (3d Cir. 1985). The Court, however, need not accept inferences drawn by plaintiff if they are unsupported by the facts as set forth in the complaint. See California Pub. Employee Ret. Sys. v. The Chubb Corp., 394 F.3d 126, 143 (3d Cir. 2004) citing Morse v. Lower Merion School Dist., 132 F.3d 902, 906 (3d Cir. 1997). Nor must the court accept legal conclusions set forth as factual allegations. Twombly, 550 U.S. at ___, 127 S. Ct. at 1965 citing Papasan v. Allain, 478 U.S. 265, 286 (1986). "Factual allegations must be enough to raise a right to relief above the speculative level." Twombly, 550 U.S. at ___, 127 S.Ct. at 1965. Although the United States Supreme Court does "not require heightened fact pleading of specifics, [the Court does require] enough facts to state a claim to relief that is plausible on its face." Id. at ___, 1974.

In other words, at the motion to dismiss stage, a plaintiff is "required to make a 'showing' rather than a blanket assertion of an entitlement to relief." Smith v. Sullivan, 2008 WL 482469, at *1 (D.Del. February 22, 2008) quoting Phillips v. County of Allegheny, ___ F.3d ___, 2008 WL 305025, at *5 (3d Cir. Feb. 5, 2008). "This does not impose a probability requirement at the pleading stage, but instead simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary element." Phillips, 2008 WL 305025, at *6 quoting Twombly, 550 U.S. at ___, 127 S.Ct. at 1965 n.3.

### 3.    Motion for summary judgment

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall be granted if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Rule 56(e) further provides that when a motion for summary judgment is made and supported, "an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party." Id.

A district court may grant summary judgment for the defendant when the plaintiff has failed to present any genuine issues of material fact. See Fed.R.Civ.P. 56(c); Krouse v. American Sterilizer Company, 126 F.3d 494, 500 n.2 (3d Cir. 1997). The moving party has the initial burden of proving to the district court the absence of evidence supporting the non-moving party's claims. Celotex Corp. v. Catrett, 477 U.S. 317 (1986); Country Floors, Inc. v. Partnership Composed of Gepner and Ford, 930 F.2d 1056, 1061 (3d Cir. 1990). Further, "[R]ule 56 enables a party contending that there is no genuine dispute as to a specific, essential fact 'to demand at least one sworn averment of that fact before the lengthy process of litigation continues.'" Schoch v. First Fidelity Bancorporation, 912 F.2d 654, 657 (3d Cir. 1990) quoting Lujan v. National Wildlife Federation, 497 U.S. 871 (1990).

The burden then shifts to the non-movant to come forward with specific facts showing a genuine issue for trial. Matsushita Elec. Indus. Company v. Zenith Radio Corp., 475 U.S. 574 (1986); Williams v. Borough of West Chester, Pa., 891 F.2d 458, 460-461 (3d Cir. 1989)(the non-movant must present affirmative evidence - more than a scintilla but less than a preponderance - which supports each element of his claim to defeat a properly presented motion for summary judgment). The non-moving party must go beyond the pleadings and show specific facts by affidavit or by information contained in the filed documents (i.e., depositions, answers to interrogatories and admissions) to meet his burden of proving elements essential to his claim.

Celotex, 477 U.S. at 322; Country Floors, 930 F.2d at 1061.

A material fact is a fact whose resolution will affect the outcome of the case under applicable law. Anderson v. Liberty Lobby, Inc. 477 U.S. 242, 248 (1986). Although the court must resolve any doubts as to the existence of genuine issues of fact against the party moving for summary judgment, Rule 56 "does not allow a party resisting the motion to rely merely upon bare assertions, conclusory allegation or suspicions." Firemen's Ins. Company of Newark, N.J. v. DuFresne, 676 F.2d 965, 969 (3d Cir. 1982). Summary judgment is only precluded if the dispute about a material fact is "genuine," i.e., if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Anderson, 477 U.S. at 247-249.

_____

### C. The Medical Record

#### 1. Issues and Omissions

Although the medical history is lengthy, a full review of the records is necessary to the disposition of the pending motions and so, the medical history is related herein. As discussed herein in Section A, throughout the pendency of this case, there have been omissions in the medical record. The Court of Appeals even acknowledged the issues with the medical records specifically questioning their accuracy and noting that Dr. Beam's declaration was contrary to the underlying medical records to which it referred. Document # 80-2, pages 6-7.

According to Defendants, the Declaration of Defendant Dr. Beam has now been "resubmitted after thorough revision, correction, and specific citation to the medical record." Document # 88, page 18 n.4. However, this Court finds that the medical record remains incomplete as the record filed in support of the presently pending dispositive motion differs in some respects from earlier filings. In fact, it is the records themselves that preclude the award of summary judgment in this case.

#### 2. Plaintiff's Medical History

In 1999, prior to his incarceration at FCI-McKean, Plaintiff had a disc herniation and

surgery to repair it. Document # 42, Second Amended Complaint, ¶ 18.[2]

On March 21, 2002, Plaintiff injured his back during a work assignment at FCI-McKean. Id. at ¶ 19. Five days later, Plaintiff reported to Health Services complaining of "mild discomfort" in his lower back. Document # 88-2, page 10 of 51. Prison medical staff prescribed pain medication and alternating hot and cold compresses. Id. Plaintiff received Motrin for his pain and the nurse practitioner told him to apply alternating hot and cold compresses. Document # 88-5, Declaration of Herbert Beam, M.D., ¶ 16.

On April 1, 2002, Plaintiff was seen for a followup visit. Id. He was examined, given medication, and was directed to continue with warm compresses and remain idle. Id. at ¶ 15.

On April 18, 2002, Plaintiff was seen by Defendant Dr. Herbert Beam, a staff physician, for lower back pain. According to Dr. Beam, he offered to prescribe a nonsteroidal anti-inflammatory drug for Plaintiff's back pain, but Plaintiff refused such medication. Id. at ¶ 16.

On May 3, 2002, Plaintiff was examined by Defendant Beam for lower back pain. Plaintiff claimed that the pain radiated down his left leg, but Defendant Beam observed that Plaintiff had no difficulty walking. Defendant Beam prescribed Motrin, advised Plaintiff to continue walking and return in six weeks. Id. at ¶ 17. Plaintiff alleges that he requested an MRI but that Defendant Beam denied his request. Document # 42, ¶ 26. The medical record does not reflect that Plaintiff requested an MRI. Document # 88-3, page 19 of 51. In Dr. Beam's declaration, he indicates that at that time "there was no medical necessity for outside consultation at this early stage in his post-injury recovery." Document # 88-5, ¶ 17.

Next, Plaintiff alleges that on May 30, 2002, he was examined by Defendant Physician's Assistant Todd Montgomery. Document # 42, Second Amended Complaint, ¶ 27 and Exhibit W, page 10. Plaintiff alleges that Defendant Montgomery told him he would be scheduled to see an orthopedic surgeon. Id. Plaintiff claims that no such appointment was ever made. Id.

---

[2] On July 1, 2005, the United States District Court for the Western District of Pennsylvania implemented the Electronic Case Management system. Therefore, all documents filed before July 1, 2005 are available in hard copy, while all documents submitted thereafter are available online.

8

Plaintiff further alleges that Defendant Montgomery erroneously informed him that only a contract orthopedic surgeon would schedule an MRI. Id. The medical records attached to the Second Amended Complaint reveal that Montgomery intended to "speak with medical officer to see if ortho consult is needed - patient educated as to plan." Id. at Exhibit W, page 10. See also Document # 88-3, page 20 of 51. This entry is not discussed in Defendant Beam's declaration.

On June 12, 2002, Plaintiff was examined by Defendant Dr. Beam at the Chronic Care Clinic. Plaintiff stated that he had "good and bad days" and the ibuprofen was not totally effective at managing his pain. Plaintiff's lower back was tender to the touch. Defendant Beam advised Plaintiff that he was considering a referral to an orthopedic consultant and directed Plaintiff to followup in three months. Document # 88-5, ¶ 18-19; Document # 88-3, page 21 of 51. Plaintiff alleges that he again requested an MRI, but that Defendant Beam again rejected the request. Document # 42, ¶ 28. The medical record does not mention Plaintiff's request for an MRI.

Plaintiff alleges that on June 27, 2002, he sent a written request to Defendant Klark complaining about his poor medical care. Document # 42, ¶ 29. Plaintiff alleges that Defendant Klark did not respond to this written request. Id.

Plaintiff alleges that on July 3, 2002, he spoke to Defendant Beam about his condition and that Defendant Beam indicated to him that he would not be able to see the orthopedic surgeon and that Plaintiff would have to learn to "just deal with" the pain. Document # 42, ¶ 30. The medical records indicate that on July 3, 2002, Defendant Beam referred Plaintiff to Dr. Soares, an orthopedic consultant. Document # 88-5, ¶ 20; Document # 88-3, page 23 of 51.

On July 10, 2002, orthopedic consultant Dr. Soares (not a defendant in this case) examined Plaintiff and gave him a steroid injection for pain relief and recommended an MRI. Document #88-3, page 23 of 51. On July 11, 2002, Defendant Beam reviewed Dr. Soares' recommendation and forwarded it to the Utilization Review Committee ("URC") for consideration. Document # 88-5, ¶ 21.

On July 15, 2002, Plaintiff alleges that he was examined by Physician Assistant Saylor (not a defendant). Plaintiff alleges that he complained of excruciating pain, that he was often

light headed, and that on several occasions he had almost blacked out due to pain. No treatment was provided to Plaintiff. Document # 42, ¶ 33.

Plaintiff alleges that on July 17, 2002, as a result of incessant excruciating pain, he filed a written request to have his meals served to him in his cell and that in response Defendant Klark met with him in his cell. Id. at ¶ 34. Later, Physician's Assistant Gracia Fairbanks (not a defendant in this case) examined Plaintiff in his cell. The medical records indicate that Plaintiff could walk with difficulty but could not sit for meals in the mess hall. Ms. Fairbanks gave Plaintiff a Nubain injection for pain and notified Defendant Dr. Olson, Medical Director, of Plaintiff's condition. Defendant Olson prescribed Tylenol with Codeine and Flexeril. Document # 88-3, page 25 of 51.

On July 19, 2002, Ms. Fairbanks examined Plaintiff and observed that he was walking slowly and cautiously. Plaintiff complained that his pain level had increased while he walked but that he was able to get relief when lying down. Plaintiff also indicated that the pain radiated down his leg. Ms. Fairbanks prescribed Naprosyn for the pain and inflammation and instructed Plaintiff to continue alternating between cold and hot compresses. Document # 88-5, ¶¶ 24-25.

That same day, Defendant Olson referred Plaintiff for another examination by the orthopedic consultant. Id. at ¶ 26; Document # 88-3, page 25 of 51. The entry in the medical records indicates that the MRI recommendation was referred to the URC. The entry further indicates that the inmate was able to walk. Id.

On July 24, 2002, Dr. Soares examined Plaintiff and gave him another injection for pain. Dr. Soares recommended a "repeat MRI of the lumbar spine;" "Reevaluation with [illegible] ASAP;" and "He may need referral to pain management for mild symptoms, or neurosurgeon for block." Document # 88-3 at page 27 of 51; Document # 88-5 at ¶¶ 27-28.

Plaintiff alleges that he sent a written request to Defendant Olson on July 24, 2002 requesting the MRI. Plaintiff did not receive a response. Document # 42, ¶ 38.

On August 1, 2002, Plaintiff filed an administrative remedy request requesting that an MRI be performed as soon as possible. Document # 42, ¶ 39. On August 5, 2002, Plaintiff was informed by Defendant Klark that the administrative request was moot because the URC had

10

approved the MRI on August 2, 2002.  Id.  The record before this Court reflects that the URC (composed of Olson, Fitch, Beam and Montgomery) approved the MRI on August 2, 2002. Document # 88-3, page 29 of 51.  Plaintiff alleges that the MRI was never scheduled. Document # 42, ¶ 40.

On August 16, 2002, Defendant Beam examined Plaintiff after housing unit staff informed him that Plaintiff had been in bed for two weeks and had only occasionally gotten up for meals.  Plaintiff complained that the pain medication only took the edge off the pain but did not relieve it.  Defendant Beam recommended an "urgent MRI" of Plaintiff and prescribed Neurotin.  Document # 88-3, page 31 of 51.  Further, Defendant Beam opined that "depending on the MRI," a transfer to a medical facility might be in order.  Id.

On August 21, 2002, Plaintiff received an MRI which revealed "a large herniation of the [disk at] L4-L5 on the left side."  Id. at page 33 of 51.  On August 27, 2002, after reviewing the MRI, Defendant Olson again referred Plaintiff to the orthopedic consultant, Dr. Soares. Document # 88-5, ¶ 34.

On August 28, 2002, Defendant Beam examined Plaintiff who reported that the injections and Neurotin only slightly reduced his pain, but admitted that he had not taken any pain medication for several days.  Defendant Beam prescribed Tylenol with Codeine and recommended that Plaintiff see the orthopedic consultant for follow-up.  Document # 88-3, page 36 of 51.

On September 4, 2002, Plaintiff was examined by Dr. Soares, who prescribed Tylenol with Codeine for pain and recommended that "he needs a referral for possible L4-5 laminectomy."  Document # 88-3, at page 35 of 51 (for clearer copy, see Document # 47, Exhibit G.

On September 11, 2002, Defendant Beam examined Plaintiff and found him to be in pain.  Defendant Beam advised Plaintiff to walk more and to return in one week for another examination and a medication refill.  Document # 88-3, page 38 of 51.  Further, the medical record indicates that Plaintiff declined a bottom bunk.  Id.

On September 19, 2002, Plaintiff filed an Inmate Sick Call slip complaining that his pain

meds had been abruptly stopped. Document # 88-3, page 40 of 51.

On September 23, 2002, Plaintiff consulted Defendant Beam by phone and the "decision was made by inmate and doctor not to renew [his pain] medication." Document # 88-3, page 41 of 51. Plaintiff denied any improvement in his back, but was observed walking freely without evidence of pain. Id. Plaintiff complained of stomach problems from the pain meds. Id.

On September 25, 2002, Plaintiff was examined by Defendant Beam at the Chronic Care Clinic. Plaintiff reported that he was doing better, that his back pain was stable, and that he had discontinued the Tylenol with Codeine. Plaintiff did not request additional pain medications. Id. at page 42 of 51.

On October 3, 2002, Plaintiff filed an Inmate Sick Call form complaining that he needed an appointment with Dr. Beam to discuss treatment for his herniated disc and that he had been informed by Defendant Klark that he had been denied a medical transfer. Id. at page 43 of 51.

On October 16, 2002, Plaintiff was examined by Defendant Beam at the Chronic Care Clinic. Plaintiff reported that he had a new sensation in his left leg. Defendant Beam told Plaintiff that this sensation was not unusual and that most herniated discs self-resolve without surgical intervention. Defendant Beam recommended continuing to rest and followup in six weeks. Id. at page 44 of 51.

According to the Declaration of Defendant Beam, sometime in October of 2002, the Bureau of Prisons' Medical Designations Section denied the request to transfer Plaintiff to a medical center for a diskectomy and advised FCI-McKean medical staff to continue local treatment. In his declaration, Defendant Beam indicates that Plaintiff's condition had stabilized and his physical examination indicated that the conservative treatment was progressing favorably. Document # 88-5, ¶ 42. **None of this is reflected in the medical records provided to this Court.**

An administrative note in the medical records indicates that on November 6, 2002, Defendant Beam saw Plaintiff in passing and Plaintiff was walking "briskly with a fluid gate" but indicated that he felt "no better, no worse." Document # 88-3, page 45 of 51.

On December 24, 2002, Plaintiff was examined by Defendant Beam. Plaintiff

12

complained that he had not been able to sit down in months and complained that he had not been scheduled for surgery. Defendant Beam told Plaintiff to continue to walk and scheduled a followup appointment. Id. at page 49 of 51. In his declaration, Defendant Beam explains that his physical examination did not support surgical intervention. Document # 88-5, ¶ 47.

On January 8, 2003, Defendant Beam examined Plaintiff. Defendant Beam indicated that his physical examination did not support surgical intervention. Id. at ¶ 48.

In January of 2003, Plaintiff submitted a request for another appointment with Dr. Soares to address his continued pain. Document # 88-3, page 51 of 51. Defendant Beam referred Plaintiff to a neurosurgeon for consultation "not because it was medically necessarily [sic] but more as the result of Mr. Cooleen's continual persistence." Document # 88-5, ¶ 49. Defendant Beam referred the matter to the URC for approval in February. Id. On February 14, 2003, the URC approved the request for the evaluation by an outside neurosurgeon. Document # 88-4, page 2 of 47. The approval was signed by Beam, Nelson, Olson and one other person whose signature is illegible. Id.

On March 27, 2003, Dr. Steven Gilman, a neurosurgeon, examined Plaintiff and diagnosed a herniated disc with a L5 radiculopathy, based on MRI taken eight months earlier in August 2002. Dr. Gilman opined:

> at this point he has all the signs and symptoms of a herniated disc and an L5 radiculopathy, so I believe that the [MRI] study is probably accurate. In any case, the study is 8 months old and if he wants to consider surgery, I think we need to get a new study. We need new information. I'd like to bring him back and have a new MRI scan done of his back just to confirm that that is what's going on and that things haven't changed. I'd also like to offer him surgery to remove the herniated disc. We discussed the surgery which would include a hemilaminectomy for removal of the herniated disc. We talked about the risks and benefits of the procedure. I think that given his situation, the best way to do this would be to bring him down for the MRI scan and admit him after that and just go ahead and do the surgery the next day. He's okay with that. We'll try to get things cleared with the institution and get the ball rolling for that.

Document # 88-4 pages 5-6 of 47.

On April 2, 2003, Defendant Beam examined Plaintiff in the Chronic Care Clinic and informed him of the planned surgery. Id. at page 7 of 47.

On May 13, 2003, Plaintiff was admitted to Hamot Medical Center in Erie,

Pennsylvania, for an MRI and spinal surgery. Dr. Gilman indicated that the new MRI "showed complete resolution of the herniated disc" and elected not to operate. Plaintiff was discharged from the hospital and returned to FCI-McKean. Document # 88-4, pages 25-26 of 47.

Dr. Gilman authored a letter dated May 23, 2003, to Dr. Beam explaining the cancellation of the surgery:

> I wanted to let you know that we did not operate on Timothy Cooleen. When he came in to the hospital, we did an MRI scan as we had planned to do the day before. He had not had one in almost a year and I wanted to have [a] new one before we did his surgery. The new MRI scan showed complete resolution of the herniated disc. There was just nothing there. It just naturally healed on its own, as we know can happen. He was still having occasional radiating pains down his legs but he clearly admits that it was better than it was. I told him that I just can't see operating on somebody who doesn't have a pinched nerve. I'm not sure what I'd exactly be doing. I think he's still feeling it in the nerve occasionally because the nerve has been hit pretty hard and it just may act funny from a little bit of focal demyelination that went on from that but I can't fix that. I just can't ethically offer him surgery for this. I'm glad it's gone away on its own.
>
> This is not however the end of this problem. It must be understood he can get this back anytime. He had had a tear in his annulus of the disc, some of the nucleus has come out, and it's resolved over time but he has a hole in the disc and he has to be pretty cautious here for awhile or he's going to blow more out. So, I think it's something he's going to have to battle over time and hopefully it won't happen again but it's not at all to be construed that his problem is gone and that he's perfect and that there's nothing wrong with him now. I think we probably ought to see how he's going in about 3 months and go from there. I'd keep him on light duty stuff, however.

Document # 88-4, page 25 of 47. A followup appointment with Dr. Gilman was scheduled for August 20, 2003. Id. at page 24 of 47.

The Medical Records indicate that on June 18, 2003, the Utilization Review Committee denied the request for follow-up treatment with Dr. Gilman because "disc had resolved completely" and that a followup appointment would be scheduled in the Chronic Care Clinic in July. Id. at page 26 of 47 (for clearer copy, see Document # 47, Exhibit C, page 41). The URC's denial is not in the record and it appears that Plaintiff's attempts to ascertain the identities of the URC were unsuccessful. Document # 88-4, pages 28-29 of 47.

On June 25, 2003, Plaintiff was seen in the Medical Department complaining of lower back pain, Plaintiff was advised to exercise and prescribed medications for his pain. Document # 88-4, page 27 of 47.

14

On July 22, 2003, Plaintiff was examined by Defendant Montgomery.  Plaintiff claimed that he was in pain twenty-four hours a day and he demanded a follow-up with the neurosurgeon, but declined pain medication.  Id. at page 30 of 47.  Plaintiff was "agitated that the followup appointment had been cancelled."  Id.  The last part of this entry indicates something about a further referral to the URC for a followup appointment, but most of this part of the entry is illegible and Dr. Beam's declaration does not explain it.  Id.; see also Document # 88-5, Beam Declaration.

The medical records indicate that the URC denied the request for a followup with the neurosurgeon on August 20, 2003 and that "instead Ortho f/u."  Document # 88-4, page 30 of 47.  Again, the URC's denial is not contained in the medical record.

Plaintiff was examined by Dr. Soares on August 20, 2002.  Document # 88-4, page 31 of 47 (for clearer copy, see Document # 47, Exhibit L).  According to the Declaration of Defendant Beam, Dr. Soares recommended that conservative treatment be continued.  Document # 88-5, ¶ 60.  However, Dr. Soares report is difficult to decipher and this Court cannot make out "continue with conservative treatment" anywhere on the face of the document.  Dr. Soares report does indicate that Plaintiff "is pending a followup exam with Dr. Gilman."  Document # 88-4, page 31 of 47.

In September of 2003, Plaintiff was transferred to FCI-Schuylkill.  Id. at ¶ 61.  In his Opposition Brief, Plaintiff claims that his transfer from FCI-McKean was retaliatory in nature.  Document # 86, page 9 ("Cooleen was transferred for attempting to secure the prescribed treatment and for assisting others in their own attempts to secure their rights as guaranteed by the Eighth Amendment.").  In March of 2004, Plaintiff underwent an MRI which revealed no evidence of recurrent disc herniation.  Document # 88-5, ¶ 62.

### D. *Respondeat Superior*

Defendants argue that Defendants Menna, LaManna, Grimm, and Smith should be dismissed because Plaintiff has failed to state a claim a claim against them.

15

According to Plaintiff's Second Amended Complaint, at all times relevant to this complaint, Defendant Menna was the Hospital Administrator; Defendant LaManna was the Warden; Defendant Grimm was the Associate Warden; and Defendant Smith was the Hospital Administrator. Document # 42. In the experience of this Court, these positions within the Bureau of Prisons are typically supervisory in nature and are usually not directly involved with medical decision-making, and are therefore generally dismissed due to lack of personal involvement. See Spruill v. Gillis, 372 F.3d 218, 236 (3d Cir. 2004) (holding that, absent a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner, a non-medical prison official will not be chargeable wit the Eighth Amendment scienter requirement of deliberate indifference).

When a supervisory official is sued in a civil rights action, liability can only be imposed if that official played an "affirmative part" in the complained-of misconduct. Chinchello v. Fenton, 805 F.2d 126, 133 (3d Cir. 1986). Although a supervisor cannot encourage constitutional violations, a supervisor has "no affirmative constitutional duty to train, supervise or discipline so as to prevent such conduct." Id. quoting Brown v. Grabowski, 922 F.2d 1097, 1120 (3d Cir. 1990), cert. denied, 501 U.S. 1218 (1991). The supervisor must be personally involved in the alleged misconduct to be held liable under § 1983. Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988). Section 1983 liability cannot be predicated solely on *respondeat superior*. Rizzo v. Goode, 423 U.S. 362 (1976); see also Monell v. Department of Social Services, 436 U.S. 658 (1978) (superiors of line officers who act in violation of constitutional rights may not be held liable on a theory of vicarious liability merely because the superior had a right to control the line officer's action).

 Supervisory liability for § 1983 violations can be established by evidence showing that officials: participated in violating a plaintiff's rights; directed others to violate a plaintiff's rights; knew of, and acquiesced in, their subordinates' violation of a plaintiff's rights; or knew of, and tolerated, past or ongoing misbehavior. Baker v. Monroe Twp., 50 F.3d 1186, 1190-91 & n. 3 (3d Cir. 1995). Plaintiff adequately alleges the personal involvement of Defendants Menna, Lamanna, Grimm and Smith in the alleged Eighth Amendment violations, particularly with

regard to the URC denials of recommended treatments. Document # 47, ¶ 92 (Defendant Menna); ¶ 98 (Defendant Lamanna); ¶ 104 (Defendant Grimm); and ¶ 110 (Defendant Smith). Although pleading allegations of personal involvement by these Defendants is far removed from proving the allegations, Plaintiff will be permitted to attempt to do so at trial as it is at least "plausible" that these Defendants were involved in the alleged violations of Plaintiff's Eighth Amendment rights through involvement in the URC process. See Twombly, 550 U.S. at ___, 127 S.Ct. at 1974.[3]

As Plaintiff has adequately alleged the personal involvement of these four Defendants, they should not be dismissed from this action on the basis of *respondeat superior*. The motion to dismiss should be denied in this regard.

### E.     The Eighth Amendment Claim

In his Second Amended Complaint, Plaintiff alleges that he received inadequate medical care following his back injury which occurred on March 21, 2002.[4] In the medical context, a constitutional violation under the Eighth Amendment occurs only when state officials are

---

[3] To the extent that Plaintiff is attempting to allege that any of these four Defendants failed to supervise the others, his claim survives the motion to dismiss. Generally, a supervising public official has no affirmative duty to supervise and discipline his or her subordinates so as to prevent violations of constitutional rights. Notwithstanding, when a supervising official knowingly permits a continuing custom or policy that results in harm to the plaintiff, Section 1983 liability may attach. Colburn v. Upper Darby Township, 838 F.2d 663, 673 (3d Cir. 1988), cert. denied, 489 U.S. 1065 (1989) overruled on other grounds by Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit, 507 U.S. 163 (1993) (applying the liberal notice pleading standards of Rule 8(a) to § 1983 actions). However, at a minimum such liability may be imposed "only where there are both (1) contemporaneous knowledge of the offending incident or knowledge of a prior pattern of similar incidents, and (2) circumstances under which the supervisor's inaction could be found to have communicated a message of approval to the offending subordinate." Id. See also Washington v. Morgan, 2008 WL 3071948 (W.D. Pa. Aug. 1, 2008).

[4] Plaintiff does not seek to recover for the injury itself. See Document # 60, Plaintiff's Opposition Brief.

deliberately indifferent to serious medical needs. Estelle v. Gamble, 429 U.S. 97 (1976). The standard is two-pronged, "[i]t requires deliberate indifference on the part of prison officials and it requires that the prisoner's medical needs be serious." West v. Keve, 571 F.2d 158, 161 (3d Cir. 1978).

A serious medical need is "one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention." Monmouth County Correction Institute Inmates v. Lanzaro, 834 F.2d 326, 347 (3d Cir. 1987). A serious medical need may also be found to exist where the denial or delay of treatment results in "unnecessary and wanton infliction of pain." Id. Defendants acknowledge that laintiff's back injury required medical attention and constitutes "a serious medical need." Document # 88, page 14.

Deliberate indifference to a serious medical need involves the "unnecessary and wanton infliction of pain." Estelle, 429 U.S at 104. Such indifference is manifested by an intentional refusal to provide care, delayed medical treatment for non-medical reasons, denial of prescribed medical treatment, a denial of reasonable requests for treatment that results in suffering or risk of injury, Durmer v. O'Carroll, 991 F.2d 64, 68 (3d Cir. 1993), or "persistent conduct in the face of resultant pain and risk of permanent injury" White v. Napoleon, 897 F.2d 103, 109 (3d Cir. 1990). Mere misdiagnosis or negligent treatment is not actionable under §1983 as an Eighth Amendment claim because medical malpractice is not a constitutional violation. Estelle, 429 U.S. at 106. "Neglect, carelessness or malpractice is more properly the subject of a tort action in the state courts." Hampton v. Holmesburg Prison Officials, 546 F.2d 1077, 1081 (3d Cir. 1976).

As the Third Circuit explained in its Opinion in this case:

> Acting with "reckless disregard" to a substantial risk of serious harm to a prisoner is consistent with deliberate indifference. See Farmer, 511 U.S. at 836. This Court has found that the standard is met when prison officials: 1) deny reasonable requests for medical treatment, and the denial exposes the inmate to undue suffering or the threat of tangible residual injury, 2) delay necessary medical treatment for non-medical reasons, 3) erect arbitrary and burdensome procedures that result in interminable delays and outright denials of care, or 4) prevent an inmate from receiving recommended treatment for serious medical needs, or deny access to a physician capable of evaluating the need for treatment. See Monmouth, 834 at 346-47; see also Durmer, 991 F.2d at 68. We have also found deliberate indifference where prison officials continue a course of

treatment they know is painful, ineffective or entails a substantial risk of serious harm.  See Rouse v. Plantier, 182 F.3d 192, 197 (3d Cir. 1999); White v. Napoleon, 897 F.2d 103, 109 (3d Cir. 1990).

* * *

[Here,] the record reveals several instances in which it appears prison officials delayed or denied certain treatment or appointments despite recommendations by medical specialists.  These include:

- On July 10, 2002, orthopedic specialist Dr. Soares recommended that Cooleen undergo an MRI to determine the extent of his injury.  The Utilization Review Committee initially rejected the procedure, and Cooleen did not have the MRI until August 21, 2002.

- On September 4, 2002, Dr. Soares referred Cooleen for a possible diskectomy.  The October 17th rejection letter from the Board of Prisons Regional Director authorizes prison officials to 'pursue local treatment' and indicates that Cooleen was 'scheduled to be evaluated by a local contract orthopedic surgeon at the earliest possible opportunity.'  Cooleen attempted to obtain the treatment described in the letter, and during appoints expressed that he was in pain.  Prison physician Beam did not refer him to a surgeon until February 2003, and Cooleen did not see that surgeon until March 27, 2003.

- Though neurosurgeon Dr. Gilman found that Cooleen's herniated disc was resolved in May 2003, he cautioned prison officials that Cooleen problem was not gone, and scheduled a follow-up appointment with Cooleen for August 20, 2003.  The Utilization Review Committee cancelled the appointment.

Document # 80-2, page 6.

This Court will examine each of the Circuit's identified concerns in turn.

1)    *The URC's initial rejection of the MRI recommended by Soares on July 10, 2002.*

In support of their initial motion to dismiss the Second Amended Complaint, Defendants provided this Court with the Declaration of Defendant Beam that indicated that the July 10, 2002, MRI recommendation was received by the URC on July 19, 2002 and was denied because the URC determined that the test was not "medically necessary" because Plaintiff "was able to walk without difficulty."  See Document # 47, Beam Declaration, at ¶¶22, 23.  Defendant Beam's declaration did not cite to any specific document in the record to support his sworn statement.

Now, Defendants have provided records to this Court in support of the pending motion for summary judgment which purport to demonstrate that they acted appropriately and quickly to approve the MRI after the July 10, 2002 recommendation. Defendants point to Document # 8803, page 29 of 51 dated August 2, 2002 which indicates that an MRI procedure was unanimously approved for Plaintiff by Olson, Fitch, Beam and Montgomery. Also contained in the current records before this Court are: Plaintiff's inmate request to staff dated 7-24-02 complaining of pain and requesting an MRI and the response dated 8-7-02 indicating that the URC had previously approved the MRI request. Document # 88-3, page 28 of 51.

So, initially in defending this case, Defendants claimed that the URC denied the recommended MRI (but presumably later approved the MRI). Now, Defendants claim that their first position was made in error and after a more thorough review of the medical records, Defendants now indicate that the URC unanimously approved Dr. Soares' recommendation for an MRI. In this regard, Defendants have created their own material issue of factual dispute so as to preclude summary judgment.

What is clear from the record is that: 1) Dr. Soares recommended an MRI on July 10, 2002; 2) Dr. Beam forwarded Dr. Soares' recommendation to the URC on July 11, 2002; 3) An URC made up of Olson, Fitch, Beam and Montgomery approved Plaintiff for an MRI on August 2, 2002; and 4) Plaintiff underwent an MRI on August 21, 2002.

What is not clear is whether an earlier URC rejected the MRI recommendation and if so, the date upon which the rejection was made, and the rationale upon which the rejection was predicated. Being that the Third Circuit remanded this case to this Court with specific instruction to focus on the delay and/or denial of treatment, whether there was an initial denial of the MRI, the date of the denial, and the basis upon which the denial was made, as well as the identities of the committee members are all of paramount importance to the delay/denial analysis.

Accordingly, summary judgment should be denied in this regard.

2) *On September 4, 2002, Dr. Soares referred Cooleen for a possible diskectomy. The October 17th rejection letter from the Board of Prisons Regional Director authorizes prison officials to 'pursue local treatment' and indicates that Cooleen was 'scheduled to be evaluated by a local contract orthopedic surgeon at the earliest possible opportunity.' Cooleen attempted to obtain the treatment described in the letter, and during appointments expressed that he was in pain. Prison physician Beam did not refer him to a surgeon until February 2003, and Cooleen did not see that surgeon until March 27, 2003.*

The medical record indicates that on September 4, 2002, Dr. Soares recommended a referral for a possible laminectomy and diskectomy. Document # 88-3, page 35 of 51 (for clearer copy, see Document # 47, Exhibit G). The document reads "Recommend: he needs referral for possible L4-5 laminectomy and diskectomy." Id.

In his Declaration, Defendant Beam indicates that "Soares recommended that Plaintiff be considered for a possible laminectomy" and that "Soares' recommendation was considered." Document # 88-5, ¶¶ 37, 38. Based on Defendant Beam's characterization of the recommendation, Defendants argue that surgery was not "mandated," but was only "mentioned" by Dr. Soares as a "possibility"and that Defendants' failure to follow it does not constitute deliberate indifference under the Eighth Amendment. Defendants miss the crucial point here.

The important point is this -- Dr. Soares, who is identified as an Orthopedic Surgeon, recommended that Plaintiff be examined by another specialist (presumably a neurosurgeon) for possible surgery. But, instead, the Bureau of Prisons rejected the recommendation and advised FCI-McKean medical staff to "continue local treatment." Id.

The circumstances surrounding the rejection are sketchy at best. While Dr. Beam cites to a medical record in his Declaration (see document # 88-5, ¶ 42), the document to which he refers is neither the denial itself nor a medical document, but instead is an Inmate Sick Call Sign-Up Sheet, authored and signed by Plaintiff, which indicates: "need appt with Dr. Beam next available date to discuss treatment for herniated disc / Mr. Menna's treatment options .... As R. Klarke has informed me that Reg. Denied a medical transfer." Document # 88-3, page 43 of 51. The record before this Court does not contain the actual denial of Dr. Soares' recommendation by the Bureau of Prisons and that omission leaves open the questions: 1) of

who rejected Dr. Soares' recommendation and 2) on what basis.

Again, because the Circuit has specifically instructed this Court to focus on the delay/denial aspects of this case, and because there is a material issue of fact as to who rejected Dr. Soares' recommendation and on what basis, summary judgment is inappropriate and should be denied.

> *3)*      *Though neurosurgeon Dr. Gilman found that Cooleen's herniated disc was resolved in May 2003, he cautioned prison officials that Cooleen's problem was not gone, and scheduled a follow-up appointment with Cooleen for August 20, 2003. The Utilization Review Committee cancelled the appointment.*

Defendants argue that the circumstances surrounding the cancellation of Plaintiff's followup appointment with Dr. Gilman were entirely justified. The consultation was cancelled by the URC because, according to Defendant Beam, Plaintiff had the services of orthopedist, Dr. Soares, who continued to monitor Plaintiff during his routine visits to McKean obviating the need for transport and the corresponding security issues (and presumably at a cost savings to the institution). Document # 88, page 22. Again, there is no documentation in the record to indicate who served on the URC that denied the Dr. Gilman followup or on what basis that decision was made. Accordingly, the motion for summary judgment should be denied. Monmouth County, 834 F.2d at 346-47 ("if necessary medical treatment is delayed for non-medical reasons, a case of deliberate indifference has been made out.").

### F.   Qualified Immunity

Alternatively, Defendants argue that this case should be dismissed against them because they are entitled to qualified immunity.

The doctrine of qualified immunity insulates government officials from liability for damages insofar as their conduct does not violate clearly established rights. Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). An officer performing his discretionary functions is

"shielded from liability for civil damages insofar as [his] conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Curley v. Klem, 298 F.3d 271, 277 (3d Cir. 2002). "Qualified immunity operates to ensure that before they are subjected to suit, officers are on notice that their conduct is unlawful." Hope v. Pelzer, 536 U.S. 730, 739 (2002).

_____ The Supreme Court has repeatedly emphasized the importance of resolving the immunity questions at the earliest possible stages of a case. Anderson v. Creighton, 483 U.S. 635, 646 n.6 (1987); Harlow, 457 U.S. at 818. However, "the imperative to decide qualified immunity issues early in the litigation is in tension with the reality that factual disputes often need to be resolved before determining whether the defendant's conduct violated a clearly established constitutional right." Curley, 298 F.3d at 277.

The analytical framework that district courts should employ in determining whether qualified immunity applies is clearly established:

> The Court explained that a qualified immunity analysis must begin with this threshold question: do the facts alleged, viewed in the light most favorable to the party asserting the injury, show that the officer's conduct violated a constitutional right? Saucier, 121 S.Ct at 2156. If the plaintiff fails to allege the violation of a constitutional right, no further inquiry is necessary. If, however, the alleged facts show that there was a constitutional violation, then the next step is to ask whether the right was clearly established. See id. In other words, a court must consider whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted. Id. This inquiry, the Court noted, must be undertaken in light of the specific context of the case, not as a broad general proposition. Id. If a court concludes that an officer's conduct did violate a clearly established constitutional right, then it must deny him the protection afforded by qualified immunity. See id. at 2156-57.

Curley, 298 F.3d at 277. See also Hope, 536 U.S. 730; Doe v. Delie, 257 F.3d 309 (3d Cir. 2001).

This Court has already addressed the threshold question in this Report and Recommendation, finding that, Plaintiff has sufficiently alleged that his Eighth Amendment rights have been violated. The next step in the analysis is to determine whether the constitutional rights were clearly established at the time of the violation. Hope, 530 U.S. at 739. "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he

confronted." <u>Saucier v. Katz</u>, 533 U.S. 194, 202 (2001). The Supreme Court has observed:

> for a constitutional right to be clearly established, its contours must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in the length of pre-existing law the unlawfulness must be apparent.

<u>Hope</u>, 536 U.S. at 739.

In this case, the legal precedent regarding the Eighth Amendment's protections was clearly established at the time of the alleged occurrence. <u>See</u> <u>Farmer v. Brennan</u>, 511 U.S. 825 (1994) (holding that under Eighth Amendment, prison officials are required to provide humane conditions of confinement, and must take reasonable measures to guarantee safety of inmates); <u>Monmouth County Correctional Institutional Inmates v. Lanzaro</u>, 834 F.2d 326, 346-47 (3d Cir. 1987) ("where knowledge of the need for medical care is accompanied by the intentional refusal to provide that care, the deliberate indifference standard has been met. [...] Short of absolute denial, if necessary medical treatment is delayed for non-medical reasons, a case of deliberate indifference has been made out. Deliberate indifference is also evident where prison officials erect arbitrary and burdensome procedures that result in interminable delays and outright denials of medical care of suffering inmates. Prison official may not, with deliberate indifference to the serious medical needs of the inmate, opt for an easier and less efficacious treatment of an inmate's condition. [...] Deliberate indifference is demonstrated when prison authorities prevent an inmate from receiving recommended treatment for serious medical needs or deny access to physician capable of evaluating the need for such treatment."). Thus, a reasonable government officer would be on notice that the conduct alleged here was unlawful.

Accordingly, Defendants are not entitled to qualified immunity and the motion to dismiss or for summary judgment should be denied in this regard.

**G.** **Plaintiff's motion for summary judgment**

Plaintiff has moved for summary judgment on his own behalf. However, for all the reasons articulated herein, this case is inappropriate for summary judgment and should be scheduled for trial.[5]

**H.** **United States of America as a Defendant**

The Clerk of Courts should be directed to terminate the United States of America as a party to this action. The United States was named as the proper Defendant to the FTCA claim. Because the FTCA claim has been dismissed and because a Bivens claim cannot be maintained against the United States due to sovereign immunity, the United States should be dismissed from this action. See F.D.I.C. v. Meyer, 510 U.S. 471, 477-78 (1994); Johnstone v. United States, 980 F.Supp. 148, 151 (E.D. Pa. 1997) (explaining that *Bivens* actions "may only be maintained against federal officers; sovereign immunity bars such actions against the United States or agencies thereof.").

**III** **CONCLUSION**

For the foregoing reasons, it is respectfully recommended that the motion to dismiss or for summary judgment filed by Defendants [Document # 87] be denied.

It is further recommended that the motion for summary judgment filed by Plaintiff [Document # 85] be denied.

It is further recommended that the Clerk of Courts be directed to terminate the United States of America as a Defendant from this action.

---

[5] Plaintiff even acknowledges that the medical records and the Declaration of Defendant Beam contradict each other as to the course of medical treatment - Document # 86, page 3.

By separate Order issued this day, the parties will be directed to file their pre-trial narrative statements.

In accordance with the Magistrate Judges Act, 28 U.S.C. § 636(b)(1)(B) and (C), and Local Rule 72.1.4 B, the parties are allowed ten (10) days from the date of service to file written objections to this report. Failure to timely file objections may constitute a waiver of appellate rights. See Nara v. Frank, 488 F.3d 187(3d Cir. 2007).



S/ Susan Paradise Baxter
SUSAN PARADISE BAXTER
Chief United States Magistrate Judge



Dated: December 19, 2008